**L.T. BLACKSHEAR, Plaintiff,**

v.

**CITY OF WILMINGTON, Defendant.**

**Civil Action No. 96–370 LON.**

United States District Court, D. Delaware.

July 31, 1998.

first sold this diaper in a ship test in Seattle in November or December of 1988. *Id.*

Kevin P. O'Neill, Wilmington, DE, for Plaintiff.

John W. Morgan, Wilmington, DE, for Defendant.

### OPINION

LONGOBARDI, Senior District Judge.

#### I.

Plaintiff L.T. Blackshear, an African American male, filed the complaint in this action on July 10, 1996, claiming that his employer, the City of Wilmington ("City"), violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., by discriminating against him on the basis of race. [Docket Item ("D.I.") 1]. In this action, Blackshear seeks compensatory damages, injunctive relief, attorney's fees, and costs.

Jurisdiction exists pursuant to 28 U.S.C. § 1331 as plaintiff seeks vindication of his federal rights. Venue is proper under 28 U.S.C. § 1391. Blackshear satisfied all jurisdictional prerequisites to this action by filing a timely charge of discrimination with the Delaware Department of Labor and the Equal Employment Opportunity Commission ("EEOC"). Following an investigation of Blackshear's charge, the EEOC concluded that the evidence established a violation of Title VII, and issued a notice of right to sue. [*Id.*].

The Court conducted a trial without a jury on February 9, 1998, and February 10, 1998. This Opinion represents the Court's findings of fact and conclusions of law.

#### II.

The City initially hired Blackshear on December 8, 1980, as a real estate representative. [D.I. 30, Tr. at 4]. In July 1985, the City transferred Blackshear to the Department of Licenses and Inspections ("L & I") where he works as a code enforcement officer. In this position, plaintiff's duties include inspecting properties in his assigned geographic area within the City to ensure compliance with building and housing code requirements. This position requires plaintiff to spend much of his time out of the office. To discharge these duties, the City deputized Blackshear with constable powers. Although a code enforcement officer ultimately attempts to obtain voluntary compliance with the code, he may compel compliance through the court system. Upon identifying a violation, Blackshear may issue a constable ticket, and the person against whom the ticket is issued will be prosecuted criminally in Municipal Court.

As a City employee, Blackshear belonged to a union, the American Federation of State, County, and Municipal Employees, AFL–CIO, Local 1102, and State Council 81 (the "Union"). The terms of Blackshear's employment are governed by the collective bargaining agreement or contract ("Contract") between the City and the Union. Blackshear actively participated in the Union serving at various times as shop steward, vice president, and president. Consequently, Black-

shear appeared thoroughly versed in the rights and obligations of employees pursuant to the Contract.

Blackshear received evaluations for his performance which the City concedes demonstrate that "he was (and is) an above average if not diligent worker." [D.I. 29]. One episode, however, marred Blackshear's exemplary record. The City terminated plaintiff in 1990 based upon charges that he falsified records, issued improper citations, coached a defendant to avoid a penalty for code violations, and was involved in a "kickback scheme" with a contractor. [DX 2].[1] After moving through the grievance procedure established by the Contract, the dispute reached arbitration. In an opinion dated February 22, 1991, Arbitrator Joseph M. Stone converted the termination to a suspension, and reinstated Blackshear without pay but with full seniority. [*Id.* at 28].

Upon returning to work at L & I, plaintiff received a superior performance evaluation from his then-supervisor Dan Muterspaw. [PX 3]. Shortly thereafter, in January 1993, Damalier J. Molina began working for the City as Commissioner of L & I. Molina's previous experience included private consulting in governmental affairs and economic development, and a position as Senior Assistant Managing Director for the City of Philadelphia. [Tr. at 161]. When Molina began working for the City, he instituted a number of changes, and the atmosphere at L & I during the transition period was tense. [Tr. at 291].

One change instituted by Molina was that all code enforcement officers reported directly to the commissioner or deputy commissioner. Molina testified that he also attempted to implement a policy prohibiting code enforcement officers from using their personal vehicles for City business. Molina further testified that in August 1993, he had concerns about Blackshear's activities during working hours.

On August 24, 1993, Molina informed Blackshear that his time would be monitored. [PX 5]. Deputy Commissioner Mary Starkey also reminded Blackshear that his keys to his City vehicle must be returned every night. [PX 6]. Most disturbing, however, were the events that unfolded on August 26, 1993.

On that date, Molina's executive secretary, Iris Rosa,[2] observed Blackshear's daily log on his chair. Rosa explained that the daily log is a form that code enforcement officers take to each inspection site. This form is submitted to the commissioner or his executive secretary after the day's inspections. The date on the log was August 26, 1993, that very day. While Rosa found Blackshear's daily log at approximately 1:15 p.m., it contained documentation for inspections for the full afternoon. Assuming that something was awry, Rosa promptly time stamped the sheet and brought it to the attention of Deputy Commissioner Starkey, the senior official in Molina's absence.

According to Rosa, Starkey instructed her to bring the daily log to the Personnel Department and seek their advice on how to proceed. [Tr. at 272]. William Yanonis, then Deputy Director of Personnel, testified that he told Rosa that an investigation must be conducted before any disciplinary action taken. [Tr. at 319]. After again consulting Starkey, Rosa commenced an investigation. [Tr. at 273].

Rosa first checked Blackshear's parking space for his City vehicle. Finding Blackshear's car in the lot, she placed her hand on the hood to determine if it had just been parked. As the hood was cool to her touch, Rosa concluded that Blackshear's car had been parked for some time even though his log placed him at inspection sites. [Tr. at 276]. Rosa then visited three of the sites listed on the daily log and spoke to a number of workers. She also drove to Blackshear's home where she observed his personal vehicle in front of his house. [Tr. at 279]. When she returned to the office, Rosa reported her findings to Starkey and drafted a memorandum to Molina.

Molina admitted that Rosa's investigation was an anomaly, and that his executive secre-

---

1. Throughout this Opinion, the Court refers to defendant's trial exhibits as "DX" and plaintiff's trial exhibits as "PX."

2. Ms. Rosa is now Iris Rosa–Boyd.

tary had never before gone into the field to investigate an inspector's report. [Tr. at 266]. Upon receipt of Rosa's report, however, Molina scheduled an investigatory interview with Blackshear to discuss charges of falsification of City records. By all accounts, the interview held on September 2, 1993, was a brief encounter. After identifying his daily log, Blackshear refused to answer any questions and abruptly left the interview on the advice of his Union president.

After this unproductive meeting, Molina wrote Blackshear to inform him that the commissioner was considering terminating plaintiff's employment with the City for falsification of records. [PX 9; DX 4]. In that letter, Molina scheduled a pre-termination hearing for September 9, 1993. [*Id.*].

Yanonis testified that a pre-termination hearing is a step in the grievance procedure at which the employee must come forward with justification to show why he or she should not be terminated. The pre-termination hearing is an appropriate first step in the grievance process when an employee faces a serious charge, such as falsification of records. Blackshear, acting in accordance with the Contract, waived his right to a pre-termination hearing.[3] [DX 5]. Thereafter, Molina terminated Blackshear's employment with the City in a letter dated September 10, 1993. [PX 11; DX 5].

Following his termination, Blackshear appealed Molina's decision by filing a third step grievance. [DX 7]. Steps one and two were averted in this matter because they involve addressing the dispute with an employee's immediate supervisor and the department chief. Because Blackshear's immediate supervisor was the department chief, steps one and two were unnecessary. Step three in the grievance process is an appeal of the immediate supervisor's decision to the Director of Personnel or his designee. The third step grievance proceeding was heard by Deputy Director of Personnel Yanonis who upheld Molina's decision. [DX 8].

Blackshear again remained mute through this process and requested that the issue be submitted to expedited arbitration.

In accordance with the procedure set forth in the Contract, Blackshear filed a fourth step grievance. [DX 9]. The fourth step is a hearing before an assistant city solicitor. In a letter dated November 12, 1993, Assistant City Solicitor Lynn S. Seth rendered her decision on the fourth step grievance. [DX 10]. Although Blackshear participated in the fourth step, Seth concluded that the City produced sufficient evidence of records falsification to justify termination. Accordingly, Seth denied the grievance and upheld Blackshear's termination.

The parties arbitrated their dispute before a neutral arbitrator, Kathrine Overton Hogan. [DX 11]. The arbitrator found that the daily log discovered by Rosa had been misdated by Blackshear, and represented his activities for the previous day. No investigation had been conducted to determine Blackshear's whereabouts on August 25, 1993. Accordingly, the arbitrator concluded that, without a more complete investigation, the City did not have just cause to terminate Blackshear. The arbitrator, therefore, ordered that Blackshear be reinstated with full back pay. [DX 11 at 20].

Blackshear argues that his termination and the investigation were motivated by racial animus. Blackshear alleged that another white code enforcement officer, Frederick Paolino, committed numerous, more serious offenses yet has not been subjected to equivalent disciplinary treatment.

The evidence demonstrated that in early 1993, Paolino's supervisor, Dan Muterspaw, had serious concerns regarding the quality of Paolino's work. Plaintiff introduced several memos from Paolino's file. [PX 19–PX 42]. The first such memo dated April 14, 1993, indicates that Muterspaw had generalized concerns about the quality of Paolino's performance. [PX 20]. Shortly thereafter on April 21, 1993, Muterspaw informed Paolino

---

**3.** The Contract provides in relevant part:

An employee may waive his or her right to pre-termination notice and hearing by signing a waiver form provided by the City Solicitor. Waiver of said rights shall not operate or be

construed as restricting or affecting in any way the rights of the Employer with regard to investigating a disciplinary matter.
[DX 1 at 13–14].

that he was seen out of his district at a time when his daily log showed he was at an inspection. [PX 22]. There is no indication that an investigation like that undertaken by Rosa in Blackshear's case was commenced in response to these charges against Paolino. Muterspaw's critique of Paolino escalated when Paolino admitted issuing a compliance letter on a property that had not been inspected. [PX 25].

Despite the barrage of memos regarding his performance in April, Paolino received a memo on June 28, 1993, citing four areas of insufficient performance including non-issuance of tickets for code violations and properties in violation being reported as compliant. [PX 28]. At this juncture, Muterspaw requested that Molina impose sanctions up to and including suspension. The record does not reflect that Molina took any action at Muterspaw's suggestion.

Nevertheless, after Molina himself became Paolino's direct supervisor, the performance issues persisted. [PX 33–PX 37]. Eventually, Molina suspended Paolino without pay for one day. [PX 34]. Through the grievance procedure, however, this suspension was reversed by Yanonis. [PX 38]. Yanonis testified that he rescinded the suspension because Paolino had personal problems and agreed to participate in a counseling program.

Blackshear offered evidence of more recent events to demonstrate that the City was motivated by racial animus. After reinstatement, Blackshear himself was prosecuted for code violations. After a trial, Blackshear was found not guilty of the violations. By contrast, Paolino and another white code enforcement officer were observed working on a property in violation of the code. Rather than prosecute the action, however, the City quashed the tickets issued to the white officers.

## III.

Blackshear claims that his discharge was motivated by racial discrimination and that the discrimination is continuing. [D.I. 1]. Title VII prohibits unlawful discrimination in the workplace providing in relevant part:

It shall be an unlawful employment practice for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ....

42 U.S.C. § 2000e–2(a)(1). The United States Supreme Court has made clear that Title VII does not tolerate any racial discrimination, however subtle, in employment-related decisions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir. 1993).

The ultimate issue in a Title VII case is whether the employer intentionally discriminated against the employee. *Sheridan v. E.I. DuPont de Nemours and Company,* 100 F.3d 1061, 1066 (3d Cir.1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). The burden ultimately rests with the plaintiff to prove that the employer discriminated against him. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Rarely, if ever, is there a "smoking gun" in an employment discrimination case. *Sheridan,* 100 F.3d at 1071. Because of the difficulty in proving race discrimination in employment, the Supreme Court developed the now-familiar burden shifting framework for cases involving discriminatory termination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must prove by a preponderance of the evidence his prima facie case. *Josey,* 996 F.2d at 637–38. Second, the burden of production shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that the employer's proffered reasons were not its true reasons, but rather pretext for discrimination. *Josey,* 996 F.2d at 638. Plaintiff's rebuttal of the employer's proffered reasons does not, however, require additional proof. *Sheridan,* 100 F.3d at 1071. Rather, the factfinder may draw an inference of discrimi-

nation from the elements of the prima facie case coupled with a disbelief of the employer's proffered reasons. *Id.* at 1066–67.

### A. *Prima Facie Case*

■ The first step in the *McDonnell Douglas* framework is to determine whether Blackshear has satisfied the elements of his prima facie case. To establish his prima facie case for discriminatory discharge, Blackshear must prove that:

1. He belongs to a racial minority (protected class);
2. he was qualified for the position;
3. he was discharged; and
4. other employees not in a protected class were treated more favorably.

*See Josey,* 996 F.2d at 637.[4]

As an African American, Blackshear is a member of a protected class. Moreover, the second element is satisfied because the evidence at trial illustrated that Blackshear was qualified for the position. Blackshear obtained a bachelor's degree from Delaware State College and had significant work experience in the real estate field prior to commencing his employment with the City. [PX 1; Tr. at 5–6]. In addition, Blackshear's evaluations demonstrate his competence in the position of code enforcement officer. As to the third element of the prima facie case, there is no dispute that the City terminated Blackshear in a letter dated September 10, 1993.

The City maintains that Blackshear has not established his prima facie case because he did not prove that other employees who are not members of a protected class received more favorable treatment from the employer. Much of plaintiff's evidence at trial compared his disciplinary record to

Frederick Paolino's record. Paolino, a white male, received several reprimands in the form of memos, but the most severe penalty imposed for Paolino's many infractions of City policy was a suspension that was later rescinded.

■ The City argues that the two code enforcement officers should not be compared because different supervisors were involved in 1993. To support this contention, the City cites *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1271 (6th Cir.1986), and *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 606 (8th Cir.1983). Those cases recognized that a change in managers is not a defense to a racial discrimination claim, but has some probative value in suggesting that a basis other than race accounts for different treatment.

The bulk of the complaints about Paolino's "sloppy recordkeeping" occurred while he reported to Dan Muterspaw. The City attempts to distinguish Blackshear's termination because, at the time of his dismissal, he reported directly to Molina. The Court finds the distinction to have little meaning in this case.

The City argues that the evidence "strongly" suggested that Muterspaw was a more lenient supervisor than Molina. [D.I. 29]. This bold assertion finds little support in the record. The City contends that Molina's one day suspension of Paolino proves that Molina was a stricter disciplinarian. The City neglects to address that Molina had been Muterspaw's supervisor prior to the elimination of Muterspaw's position, and received copies of various memoranda relating to Paolino's alleged infractions of L & I policy. [PX 23; PX 25; PX 28]. In a memo to Paolino dated June 28, 1993, Muterspaw wrote:

> Be advised that your performance/behavior is completely unacceptable and you have

---

4. The *Josey* formulation differs slightly from the elements of the prima facie case set out recently in *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). In *Sheridan,* the Court cited the following elements to establish a prima facie case for discriminatory discharge: (1) plaintiff is a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) the position was ultimately filled by a person not of the protected class. *Id.* at 1066 n. 5. The Third Circuit has recognized, however, that the elements of the prima facie may vary depending on the different factual issues. *Bray v. Marriott Hotels,* 110 F.3d 986 (3d Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). The elements set forth in *Josey* more appropriately suit this case because plaintiff has already been reinstated to the position by the arbitrator.

been warned that further occurrences would not be tolerated. By a copy of this memorandum going to L & I Commissioner Molina, I am requesting that disciplinary action, up to and including suspension, be taken.

[PX 28]. Although it appears that Molina asked for documentation regarding the allegations against Paolino, [PX 30], there is no evidence that any action was taken against Paolino in 1993. The Court finds that Molina was aware of Paolino's disciplinary problems, but did not attempt to sanction Paolino in any way during 1993. Accordingly, the Court concludes that Paolino, a white code enforcement officer, was a similarly situated employee who was treated more favorably than Blackshear.

Reiterating that the plaintiff's burden to establish a prima facie case is "not onerous", *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir.1998) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089), the Third Circuit noted that a plaintiff may satisfy his burden at this stage by comparison to a single member of a non-protected class. *Id.* The Court therefore finds that Blackshear satisfied all the elements of his prima facie case.

## B. *Employer's Proffered Reasons*

■ If plaintiff establishes his prima facie case, the employer must come forward with some evidence which, if taken as true, demonstrates that there was a legitimate, "nondiscriminatory reason for its adverse employment action." *Sheridan*, 100 F.3d at 1066. At this stage of the inquiry, the employer must clearly set forth its reasons for the adverse employment action so that the plaintiff has a "full and fair" opportunity for rebuttal. *Hicks*, 509 U.S. at 516, 113 S.Ct. 2742.

■ The City argues that three reasons justify its decision to discharge Blackshear. First, on August 26, 1993, the City believed that Blackshear falsified department records. Second, plaintiff, unlike Paolino, was unresponsive and uncooperative during the grievance process. Finally, Blackshear had a prior disciplinary record that included an eight month suspension for offenses including falsification of time records.

All of these assertions have support in the record. Molina testified that in the beginning of August, he expressed to Blackshear his concerns about Blackshear's allocation of time in the office. [Tr. at 164]. To address that concern, Molina instructed Blackshear to submit documentation for his time. [*Id.*]. Once Rosa found the misdated time sheet, the commissioner and deputy commissioner of L & I had reason to believe that Blackshear had falsified records.

Molina, Rosa, and Yanonis were also consistent in their testimony that Blackshear remained mute through the investigatory and grievance process until it reached the City Solicitor's Office. In her opinion denying the grievance, Assistant City Solicitor Lynn S. Seth noted that plaintiff came forward with his own account at the step 4 grievance proceeding, but previously "remain[ed] mute at his peril." [DX 10 at 5].

Yanonis recognized that Blackshear had a right to waive his pre-termination hearing and to refuse to participate in the grievance procedures. [Tr. at 324]. Indeed, in her opinion on the grievance, Assistant City Solicitor Seth noted that Blackshear could not be compelled to "respond to the charges levied against him." [DX 10]. Nevertheless, Yanonis and Molina each testified that the City had to act on the information it had at the time of the pre-termination proceedings. [Tr. at 173; Tr. at 325]. Yanonis believed that, with no countervailing argument being put forth by the Union, the City's "only alternative" was to terminate Blackshear. [Tr. at 325].

Molina's and Yanonis's actions are supported by the Contract. Although Blackshear had the right to refuse to participate in an investigatory and grievance proceeding, the City was not prohibited from moving forward in light of the refusal. The Contract specifically states that waiver of the right to pre-termination notice and hearing "shall not operate or be construed as restricting or affecting in any way the rights of the Employer with respect to investigating a disciplinary matter." [DX 1 at 14]. Accordingly, the City was within its right to act without any participation from Blackshear.

The City's third justification for its termination of Blackshear is that he had a prior disciplinary record. The City discharged Blackshear in 1990, and reinstated him after arbitration. In 1990, the City charged Blackshear with "official misconduct." [DX 2 at 22]. Among the charges levied against Blackshear was that "on numerous occasions during the past year [Blackshear] either abused or misused City time and intentionally falsified the records/time sheets in an effort to disguise his whereabouts." [Id.]. After reviewing the record with respect the charge of falsification of records, Arbitrator Stone concluded that Blackshear "engaged in conduct that warranted disciplinary action and that the City had a sound basis for taking disciplinary action, albeit not necessarily termination." [Id. at 24]. In light of that decision, Blackshear had a prior history of falsification of City records.

The Contract addresses the effect of prior disciplinary action on a pending disciplinary proceeding:

> In administering discipline, the Employer shall give effect to prior disciplinary action slips only if they have been issued within the twelve (12) month period immediately preceding the occurrence of the action for which discipline is sought, provided however, that in any situation in which a disciplinary action slip has issued for the same misconduct, all prior disciplinary action slips may be considered which are for the same misconduct and for which the employee has had a similar citation within twelve (12) calendar months.

[DX 2 at 15]. Blackshear's prior disciplinary charge was for falsification of records. As such, Molina could properly consider the prior history despite the elapsed time between the alleged offenses.

■ When deciding whether a defendant satisfied its burden of production, the Court does not make any credibility determinations. *Hicks,* 509 U.S. at 509, 113 S.Ct. 2742. "For the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *Id.* (emphasis in original). The Court need only consider whether defendant has produced evidence of nondiscriminatory reasons. *Id.* Having considered the testimony and the evidence, the Court finds that the City satisfied its burden of production to demonstrate legitimate, nondiscriminatory reasons for its termination of Blackshear. All three of the defendant's proffered reasons find support in the record and are properly considered when making an employment-related decision.

### C. *Plaintiff's Demonstration of Pretext*

■ Once the employer offers a nondiscriminatory reason for the discharge, the Court must turn to the ultimate question: whether the defendant unlawfully discriminated against the plaintiff. *Id.* at 511, 113 S.Ct. 2742. The plaintiff's burden at this stage requires more than that required to prove a prima facie case. *Simpson,* 142 F.3d at 646. Plaintiff must prove *"both* that the [employer's] reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742 (emphasis in original). The Third Circuit has explained that "the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). To discredit the employer's proffered reasons, a plaintiff must:

> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.

*Bray,* 110 F.3d at 990 (quoting *Fuentes,* 32 F.3d at 765) (alteration in original). "[T]he elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings, beyond which the [factfinder] is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." *Sheridan,* 100 F.3d at 1066–67.

■ Rarely is a plaintiff able to provide any direct evidence of an employer's discrim-

inatory intent. As such, a plaintiff in an employment discrimination case must depend upon circumstantial evidence to prove his case. *Id.* at 1071. Thus, the factfinder's role is to determine whether an inference of discriminatory intent is warranted based upon the evidence presented. *Id.* Having concluded that Blackshear established a prima facie case of discriminatory discharge, the Court must examine the City's asserted reasons for its action.

■ The City's first reason for Blackshear's termination is that it had reason to believe that Blackshear falsified his daily log. This belief was based upon Rosa's discovery of Blackshear's unsubmitted daily log found on his desk and the ensuing investigation. After examining the papers on Blackshear's desk, she immediately assumed the worst.

Rosa brought the log to the attention of Starkey who instructed Rosa to "write-up" Blackshear. Thus, the immediate inclination of L & I supervisors was to punish without question. Rosa and John Albanese both testified that code enforcement officers carry radios while in the field, and are available to the office staff when needed. Nonetheless, there was no indication that anyone attempted to contact Blackshear to ascertain his whereabouts or question him directly about the daily log.

The Court must note that it finds Rosa's investigation of Blackshear of great significance. Her account of her actions conjures images of a ridiculous crusade that bears more resemblance to a witch-hunt than a simple verification of another employee's time records. By feeling the hood of Blackshear's car and secretly observing his home, Rosa's investigation took on the attributes of a "spy-thriller" movie.

As mentioned above, Molina stated that an investigation of that sort conducted by his executive secretary was an anomaly. [Tr. at 266]. Rosa also stated that such an investigation is unusual. [Tr. at 290]. She further testified that she personally did not seek advice from the Personnel Department when problems with other employees came to her attention. [*Id.* at 291]. In this situation, however, Deputy Commissioner Starkey instructed Rosa to do so. [*Id.*]. Although Molina was not in the office on the day of her tour of Blackshear's inspection sites, Rosa testified that she spoke to Molina who was attending a conference. [Tr. 275]. Molina's own testimony reveals that he knew of Rosa's actions and approved of them, even suggesting that she obtain Blackshear's parking records. [Tr. at 167].

By contrast, Molina had notice of numerous accusations levied against Paolino, and yet the evidence does not indicate that any investigation, much less a covert operation, was proposed or authorized. The stark differences in the manner in which the City handled the allegations of misconduct against Blackshear and Paolino demonstrates that there was a secret agenda to remove Blackshear.

Molina testified that the crucial distinguishing factor between Paolino and Blackshear was that Paolino came forward during the investigatory process and explained himself. [Tr. at 218]. This does not account for the differences in the investigatory techniques employed. When an employee is ambushed with evidence obtained by a would-be investigator-secretary, his or her natural reaction may be to thwart the efforts of the adversary lest they obtain more ammunition. Once the grievance proceeding reached a person who had not been directly involved in the investigation, Blackshear was forthcoming in his explanation.

By contrast, the evidence indicates that Paolino received many warnings before facing any disciplinary proceeding. Rather than being attacked with secretly gathered evidence, Paolino appeared to be aware of the charges he faced. Distinguishing between Paolino and Blackshear based upon the degree of participation in the disciplinary process does not explain the disparate treatment in the investigation of their alleged misconduct.

The City also asserts that its termination of Blackshear was justified because of Blackshear's prior suspension. While the City could properly consider Blackshear's disciplinary record in making the decision to terminate him, there is no evidence that they did so. Molina indicated that the prior charge

played no part in his decision-making process. [Tr. at 238]. Knowledge of the substantive offenses plays a determinative role in whether the prior offense may be properly considered under the Contract. [*See* DX 2 at 15]. Without a demonstrable knowledge of the substantive charges and the conclusions of the arbitrator, Molina could not have factored the prior offense into his calculation when deciding an appropriate punishment.

■ Blackshear's complaint alleged that the discrimination is continuing. Blackshear offered evidence of more recent events underscoring the disparity in treatment and that tended to show he works in a hostile environment. Although Blackshear did not assert a hostile environment claim in his complaint, such evidence is probative of the employer's motive and is relevant to proving pretext. *See Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir.1996) ("such evidence does tend to add color to the employer's decisionmaking processes and to the influences behind action taken with respect to the individual plaintiff.") (quotations omitted). Thus, at trial, the Court admitted the evidence to shed light on the employer's motivation.

On September 26, 1997, Deputy Commissioner Starkey received an anonymous call stating that unpermitted plumbing work was being done at a rental property owned by Blackshear. [Tr. at 183]. Upon receiving this information, both Molina and Starkey ventured into the field to investigate. Blackshear's father allowed the two to enter the property, and they proceeded to inspect recent plumbing work. [*Id.* at 184]. Molina testified that he observed polyethylene or PEX tubing being used for the hot and cold water systems. [*Id.* at 184–85]. Molina believed the tubing to be new as the product has not been on the market for a significant period of time. [*Id.*]. Fearing the appearance of impropriety, Molina radioed another code enforcement officer, John Albanese, to report to the scene and issue a ticket. [*Id.* at 189]. Molina stated that he first attempted to contact Jose Natale, the code enforcement officer for that district. [*Id.* at 187]. Unable to reach Natale, Molina then contacted Albanese. [*Id.*].

Alarmed that an out-of-district inspector was called to his property, Blackshear also appeared at the rental property. [Id. at 55; 186]. Blackshear admitted that he performed some work to unclog a toilet, [*id.* at 57], but vehemently denied installing a new water system at the property. [*Id.* at 55].

Albanese testified that plumbing was not his category of expertise, [*id.* at 140], but that he had faith in the knowledge of his supervisors. [*Id.* at 138]. Eventually, on December 7, 1997, Albanese issued a ticket to Blackshear for the September violation. [*Id.* at 135]. Acknowledging that there was an unusual delay between the violation and the citation, [*id.* at 136], Albanese expressed reluctance to issue the ticket against Blackshear. [*Id.* at 137]. Indeed, Albanese hesitated to write the ticket until ordered to do so by his immediate supervisor. [*Id.* at 138].

Blackshear faced prosecution in Municipal Court, and the case went to trial in January 1998. After the trial the municipal court judge found that the City produced insufficient evidence to support the charge.

Shortly after the trial, Albanese and Paolino were also suspected of violating the code. State Representative Arthur Scott testified that on January 9, 1998, he observed Code Enforcement Officers Albanese and Paolino performing construction work at a site within the City. [Tr. at 349]. Familiar with the code from his experience as a city councilman, Scott knew that it prohibited code enforcement officers from participating in construction projects. [*Id.* at 351]. Scott took pictures of the officers and reported his findings to Starkey. [*Id.*]. Scott attempted to discuss the situation with Molina, who he described as unresponsive. [*Id.* at 353]. After much badgering, Scott persuaded Starkey to visit the work site. [*Id.* at 352].

The Court notes that the City attempted to impugn Scott's credibility. He could not recall testifying against Blackshear at a prior arbitration hearing, although he was the one who informed L & I that Blackshear had misused City time. [*Id.* at 360]. A neighbor of Blackshear, Scott has a history with L & I as he was required to demolish his own porch at considerable expense. [*Id.* at 361]. As Scott's testimony related to recent events,

however, the Court finds Scott's testimony credible. Scott's account suggests that Starkey and Molina were less than enthusiastic in pursuing an investigation into the misconduct of white code enforcement officers, despite the City's characterization of Molina as a stern disciplinarian.

Art Walker, a black code enforcement officer, issued tickets against Paolino and Albanese for the violations. After consultation with the Law Department, however, the tickets were quashed. In the opinion of Assistant City Solicitor Rosamaria Tassone, the attorney assigned to prosecute code violations in municipal court, the officers operated under a legal disability. Under the code, neither officer was able to obtain a building permit for a property he did not own. Consequently, Tassone reasoned that they could not be prosecuted for failure to obtain a permit. Tassone advised L & I to pursue the matter through internal disciplinary avenues instead of municipal court prosecution.[5] Before rendering her opinion to Molina and Starkey, Tassone consulted with Trevor Knight, the Plans Engineer in L & I and supervisor to some inspectors. [Tr. at 313]. Tassone stated that she benefitted from Knight's knowledge of L & I practice and procedures. [*Id.*]. Knight, a black employee, [*id.* at 315], pointed out that the restriction upon employees should factor into a decision on how to proceed with the tickets issued to Paolino and Albanese. [*Id.* at 313].

Tassone testified that she prosecuted Blackshear because, as an owner of the property, he did not operate under a similar legal disability. In other words, there was no legal impediment to Blackshear obtaining a permit for plumbing work. Conversely, Paolino and Albanese could not have obtained permits for the work they performed because they did not own the property.

Although reasonable minds could dispute Tassone's interpretation of the BOCA code, there was no indication that she was motivated by race in prosecuting Blackshear while advising L & I to quash the tickets against the white code enforcement officers. The

significance of the recent events is the demonstrable difference in the willingness of L & I supervisors to personally participate in the investigation of misconduct. While both Molina and Starkey personally inspected Blackshear's rental property, Scott testified that Molina appeared uninterested in the misconduct of white code enforcement officers.

These differences prompt a conclusion that an impermissible consideration, race, entered the equation. When a supervisor appears eager to sanction a black employee yet exhibits disinterest in the misconduct of white employees, the specter of discrimination looms inferentially.

In determining whether Blackshear proved that the City intentionally discriminated against him, the Court notes that the bulk of Blackshear's evidence at trial involved comparisons between Blackshear and Paolino. In *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir.1981), the Eighth Circuit cautioned that a comparison to a single employee should be scrutinized closely. The Third Circuit recently examined a plaintiff's reliance on a single comparator in an Age Discrimination in Employment Act case. *Simpson*, 142 F.3d at 645–47.

■■■ In *Simpson*, the Third Circuit explained that courts cannot view a comparison to a single member of a protected class in a vacuum. *Id.* at 645. The court agreed with the premise set forth in *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir.1993), where the Seventh Circuit opined that "a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons." *Simpson*, 142 F.3d at 646. The Third Circuit expanded on that principle stating:

> [T]o hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one

**5.** As of the date of trial in this matter, Albanese testified that the outcome of the administrative

proceeding was pending.

member of the protected group regardless of how many other members of the non-protected group were treated equally or less favorably.

*Id.* Comparison to one other employee may support an inference of discrimination at the prima facie stage of the discrimination inquiry, but more is required to establish pretext. *Id.*

Mindful of the skepticism with which a comparison of a single employee should be viewed, the Court finds that Blackshear carried his ultimate burden and proved that the City was motivated by illegal discrimination when it terminated him. The City's reasons for its employment action strain credulity. The Court finds that these reasons are unworthy of credence and constitute mere pretext for an illegal motive. Given the repeated disparity of treatment between Blackshear and white code enforcement officers, the Court concludes that discrimination was the reason for the City's action. The Court therefore finds that the City violated Title VII by discriminating against Blackshear.

### IV.

Blackshear seeks damages, injunctive relief, attorney's fees, and costs. [D.I. 1]. Through arbitration, Blackshear has been reinstated to his position and awarded back pay. Such remedies, though often sought in Title VII cases, are not at issue here.

#### A. *Compensatory Damages*

■ The 1991 amendments to the Civil Rights Act made compensatory damages available for injuries resulting from unlawful employment discrimination.[6] 42 U.S.C. § 1981a(a)(1). These damages include:

future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses . . . .

42 U.S.C. § 1981a(b)(3). The amount of damages awarded is limited by statute. *Id.* The maximum permissible amount of damages awarded against an employer with more than 500 employees is $300,000. *Id.* This maximum allowable award is comprised of both compensatory and punitive damages. Punitive damages, however, cannot be awarded in this case.[7]

■ To recover compensatory damages in a Title VII case, the plaintiff must present evidence of actual injury. *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1121 (3d Cir.1988) (addressing damages pursuant to 42 U.S.C. § 1981). Courts have held that intangible injuries such as sleeplessness, headaches, and feelings of humiliation and embarrassment are sufficient to support an award of compensatory damages. *See id.; see also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir.1998) (discussing available damages under 42 U.S.C. § 1981a). While plaintiff must demonstrate "a discernable injury," medical evidence or corroborating testimony is not always necessary to support an award of mental anguish damages. *Id.* at 1046; *see also Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357 (8th Cir.1997) (Title VII); *Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994) (expert testimony not necessary to corroborate emotional distress damages in a § 1983 case).

■ Plaintiff offered only his own testimony at trial regarding the damages he suffered as a consequence of the City's unlawful discrimination. After his termination, Blackshear experienced stress, loss of appetite, and weight loss. [Tr. at 74]. He described being depressed, and resorting to selling personal jewelry and collecting aluminum cans

---

**6.** Title 42, United States Code, section 1981a(a) provides in relevant part "[i]n an action brought by a complaining party under section 706 or 717 of the Civil Rights act of 1964 (42 U.S.C.2000e–5) . . . against a respondent who engaged in unlawful discrimination . . . the complaining party may recover compensatory . . . damages . . . ."

**7.** Generally punitive damages are available against an employer who violates Title VII, however, governmental subdivisions are specifically excluded from this statutory provision. 42 U.S.C. § 1981a(b)(1). As a municipal corporation, the City is a governmental subdivision not subject to punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that municipalities are immune from punitive damages under 42 U.S.C. § 1983).

in order to pay bills. [*Id.* at 76]. Although Blackshear owns a number of rental properties, he indicated that the units were not fully rented and thus did not yield a significant positive cash flow. When asked on cross-examination why he did not attempt to sell the rental properties, Blackshear responded that the properties are mortgaged and that market conditions at the time were not favorable. [Tr. at 124]. In these circumstances, Blackshear determined that selling the property at a loss was not a viable solution to his economic woes. [*Id.*].

Blackshear introduced medical records to support his claim of depression. Blackshear's physician, Kenny Cooper, M.D., wrote a letter in November 1994, describing plaintiff's condition. [PX 44]. Noting Blackshear's employment difficulties in the latter part of 1993, Dr. Cooper diagnosed Blackshear as suffering from, inter alia, reactive depression and treated him with medication for this condition. [*Id.*]. Dr. Cooper followed a course of medication with counseling and wrote that in 1994, Blackshear's symptoms subsided and he "was able to return to what was previously his baseline." [*Id.*]. Dr. Cooper noted Blackshear's return to work and indicated that Blackshear was "doing well without medication." As of the date of the letter, Dr. Cooper stated that follow-up appointments were no longer necessary and that Blackshear need only return to his office for acute medical problems. [*Id.*].

Based upon Blackshear's own testimony and Dr. Cooper's letter which was offered into evidence without objection, the Court concludes that, in 1993 and 1994, Blackshear suffered from depression, anxiety, and mental anguish as a result of the City's discrimination. The Court finds Blackshear's testimony regarding his emotional state during those years credible. Accordingly, the Court will award Blackshear compensatory damages in the amount of $30,000 for his emotional distress and mental anguish.[8]

▮ Blackshear also testified that he currently suffers from trigeminal neuralgia, a nervous condition affecting the left side of his face. [Tr. at 74]. As of the date of the trial, Blackshear was on disability leave from his position with the City and had recently undergone multiple surgeries for the condition. Blackshear stated that he initially experienced the symptoms of his conditions in 1993 and 1994, and that the severe stress he suffered during those years substantially contributed to his affliction. [*Id.* at 75]. The Court finds that the evidence attributing Blackshear's present condition to an incident which occurred 5 years earlier is not supported by sufficient evidence. Blackshear's lay opinion as to the cause of his neurological condition is insufficient to connect the City's termination of him with his current medical problems.

In concluding that the evidence is insufficient to link Blackshear's present neurological condition to the City's termination, the Court notes that in November 1994, Dr. Cooper believed that Blackshear no longer suffered any medical problems. Although Dr. Cooper did not testify, plaintiff offered the doctor's observations. To the extent that plaintiff's testimony contradicts his own evidence, the Court will not credit Blackshear's personal assessment of the cause of the trigeminal neuralgia.

### B. *Injunctive Relief*

▮ Blackshear asked the Court to issue an injunction ordering the City to cease and desist all discriminatory behavior directed at him. In his complaint, Blackshear al-

---

8. In addition to considering all the evidence, the Court notes that in arriving at this figure it examined awards in similar cases. *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 579 (7th Cir.1996) (when reviewing a compensatory damage award an appellate court will examine whether the award is "monstrously excessive;" bears a rational relation to the evidence; and "is roughly comparable to awards made in similar cases."). *See, e.g., Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357–58 (8th Cir.1997) (reducing compensatory damages award from $150,000 to $50,000); *Hendry v. Schneider*, 116 F.3d 446, 450 (10th Cir.1997) (upholding compensatory award of $50,000 as supported by evidence of "extreme and continuing sexual harassment"); *McClam v. City of Norfolk Police Dept.*, 877 F.Supp. 277, 284 (awarding plaintiff $15,000 for his headaches, difficulty sleeping, and diminished self-esteem); *Ray v. University of Arkansas*, 868 F.Supp. 1104, 1128 (E.D.Ark.1994) (awarding $10,000 in compensatory damages for embarrassment and mental anguish).

leged that the discrimination against him is continuing. The Court discussed and evaluated the recent conduct in concluding that the City was motivated by a discriminatory intent when it terminated Blackshear.

Title VII provides for equitable relief stating:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in such unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice . . . .

42 U.S.C. § 2000e–5(g). After a finding of discrimination in a Title VII case, the district court is afforded broad latitude to issue injunctions. *Dombeck v. Milwaukee Valve Co.*, 40 F.3d 230, 238 (7th Cir.1994); *Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028 (8th Cir.1994). An injunction often furthers the salutary goal of Title VII, making victims whole and eradicating discrimination in the workplace. *See Dombeck*, 40 F.3d at 238.

In denying requests for injunctive relief, other courts have noted that the discriminatory conduct has been abandoned. *See* 5 Lex K. Larson, Employment Discrimination § 90.04[1] (2d ed.1996). Courts will also deny the request for an injunction when it will not benefit the plaintiff personally. *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346, 1354 n. 14 (D.Del.1978), *aff'd*, 591 F.2d 1334 (3d Cir.1979). Here, plaintiff established that the discriminatory conduct is continuing, and an injunction would benefit Blackshear personally because he remains in the City's employ. Consequently, the Court will enter an injunction barring the City from engaging in discriminatory behavior directed at Blackshear. Such an injunction is narrowly tailored to benefit the plaintiff and will prevent further violations of Title VII.

 At trial, Blackshear asked that the Court further order the City to "conform[ ] to standard management-type procedures." [Tr. at 87]. The Court declines the request to include this directive in an injunction. An order requiring the City to practice effective management would be overbroad, and is largely unconnected to the discrimination claims at issue in this case. Although Blackshear testified that he has not been evaluated in recent years, he adduced no evidence indicating that others had been evaluated. Thus, there is no evidence of discrimination in the City's failure to provide employees with annual evaluations.

### C. *Attorney's Fees and Costs*

 Blackshear also seeks attorney's fees and costs of suit. Section 2000e–5(k) provide the Court with discretion to "allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs . . . ." 42 U.S.C. § 2000e–5(k). The Third Circuit has established a test to determine whether a party qualifies for an award of attorney's fees:

> First, the plaintiff must be a 'prevailing party'; i.e., the plaintiff must essentially succeed in obtaining the relief sought on the merits. Second, the circumstances under which the plaintiff obtained the relief sought must be causally linked to the prosecution of the Title VII complaint, in the sense that the Title VII proceedings constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.

*Sullivan v. Commonwealth of Pennsylvania Dept. of Labor and Indus.*, 663 F.2d 443, 452 (3d Cir.1981). Under these standards, attorney's fees are generally available "whenever a civil rights cause of action ultimately results in the plaintiff's having obtained relief." *Id.* at 447. Having succeeded in his claim for damages and injunctive relief, Blackshear is a prevailing party. Accordingly, an award of reasonable attorney's fees would be appropriate upon a proper motion.[9]

### V.

In conclusion, the Court finds that the City intentionally discriminated against Blackshear on the basis of race in its decision to terminate his employment in September 1993. The Court awards compensatory damages to Blackshear in the amount of $30,000

---

9. Pursuant to Federal Rule of Civil Procedure 54(d)(2), a motion for attorney's fees must be made no later than 14 days after entry of judgment.

for his mental anguish and emotional distress resulting from the City's unlawful discrimination. The Court will further enter an injunction prohibiting the City from engaging in discriminatory behavior directed at Blackshear. The Court will enter judgment in favor of plaintiff L.T. Blackshear.