Samir M. MOUSSA, M.D., Plaintiff,

v.

COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE, Polk Center, Christopher P. Gorton, as Agent and Employee thereof, and Christopher P. Gorton, an individual, Defendants.

Civil Action No. 00–225.

United States District Court, W.D. Pennsylvania.

Oct. 23, 2003.

Vernan Lee Bailey, Meadville, PA, for plaintiff.

Rodney M. Torbic, Craig E. Maravich, Office of the Attorney General, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Presently pending before the Court in this Title VII employment discrimination case is a motion for judgment as a matter of law or, alternatively, a new trial filed on behalf of Defendant the Commonwealth of Pennsylvania Department of Public Welfare ("DPW").[1] In October of 2002 this case proceeded to trial on Plaintiff's claim that he was unlawfully terminated from his employment at the Polk Center on the basis of his national origin. At the conclusion of the trial testimony, this Court denied Defendant's motion for judgment as a matter of law relative to this claim. The jury subsequently returned a verdict in Plaintiff's favor and awarded $750,000 as compensation for his emotional damages. Upon further careful review, we conclude that Defendant's motion for judgment as a matter of law should have been granted at the conclusion of the case and, for the reasons set forth below, we do so here. Alternatively, we grant Defendant's request for a new trial.

### I. Factual Background

Plaintiff Samir Moussa, M.D. is an Egyptian-born physician currently employed at the Polk Center (hereafter, "Polk" or the "Center") in Venango County, Pennsylvania. Polk is a hospital for mentally retarded and disabled individuals and is managed by DPW, an agency of the Commonwealth of Pennsylvania. Plaintiff was originally hired as a physician at Polk in 1986. In 1995, he became Medical Director of the Center. (Trial Tr., 10/25/02 at p. 5.)

In the fall of 1996, the Department of Health (DOH), a separate Commonwealth agency, conducted a survey of all services provided at Polk in order to evaluate its compliance with federal Medicaid standards. (Tr. 10/28/02 at pp. 47–49.) On November 1, 1996 DOH notified the Center as part of its "exit interview" that DOH's survey team had found numerous deficiencies, nearly all of which involved the health care services that Polk rendered to its residents. (Id. at p. 50–51; Def. Ex. S.) Among the more serious problems noted by DOH were findings that the deaths of several residents appeared to have been preventable, that in certain cases patients' fractures had gone undiagnosed, that staples had been used to suture lacerations on residents' faces and scalps, and that open wounds were commonly stapled or sutured without the use of anesthesia. (Tr. 10/28/02 at 52–55, 60; Def. Ex. S.)

As a result of these findings, DOH put Polk on notice that it would be decertified in ninety (90) days if the deficiencies were not corrected. (Id. at 50, 55–56.) Decertification would have made the Center ineligible for any federal funding which, at that time, accounted for about half of Polk's operating income. (Id. at p. 56.) As a practical matter, decertification would have resulted in the Polk Center shutting down. (Id.)

In response to this crisis, Dr. Christopher Gorton, then the state-wide Medical Director for DPW's Office of Mental Retardation ("OMR"), and Mr. Michael Stauffer, then the DPW bureau director responsible for state centers operations, undertook measures to address those deficiencies identified by the DOH. As part of their plan of correction, Dr. Gorton and Mr. Stauffer created an Independent Eval-

---

[1] Plaintiff actually named as Defendants both DPW and the Polk Center. The parties seem to agree, however, that DPW is the real party in interest. For the sake of simplicity, we refer to DPW as the sole Defendant.

uation Team ("IET") to assess the overall functioning of the Polk Center and instituted committees to review the incident reports (referred to as "MR–34" reports) of all Polk residents for risk management purposes. (Tr. 10/28/02 at pp. 57–61.) In addition, DPW began an internal administrative investigation relative to those physicians implicated in the cases of seemingly preventable deaths. (*Id.* at 58.) It also required Plaintiff, in his capacity as Medical Director, to implement a policy prohibiting the application of sutures or staples without anesthesia and further prohibiting the use of staples to close facial and scalpel wounds. (*Id.* at 57–58.)

In January of 1997, the IET identified a "laundry list" of practices at Polk which were inconsistent with the overall standards of OMR. (Tr. 10/28/02 at 62.) Based on the IET's review, DPW concluded that there was a need for change in the Polk Center's leadership. (*Id.* at pp. 62–63; Def. Ex. Q.) On December 9, 1996 the Center's Facility Director, David Kucherawy, asked Plaintiff to step down from his position as Medical Director. (Tr. 10/25/02 at pp. 9–10; Tr. 10/28/02 at 63.) Plaintiff agreed and continued as a staff physician at Polk. Mr. Kucherawy was himself removed by DPW in January of 1997. (Tr. 10/28/02 at p. 62.) Additionally, Polk's Personnel Director and Assistant Superintendent for Administration were replaced. (*Id.* at p. 120.) Aside from Plaintiff, all of the persons who were removed from top level management positions were American-born. (*Id.* at 119–120.)

In addition, the IET specifically conducted a "top to bottom" review of Polk's clinical services, evaluating everything from the manner in which progress notes were recorded to the adequacy of Polk's health care equipment. (Tr. 10/28/02 at pp. 64–65.) Among the problems noted were complaints by Polk nurses that they were often left to evaluate injuries on their own. In light of this concern—as well as the previous incidents involving undiagnosed fractures and the difficulty Polk residents sometimes had in communicating their medical problems—Polk instituted a new policy requiring physicians to personally evaluate any patient who had a potentially harmful injury, even if it was minor. (*Id.* at pp. 65–66.)

Part of DPW's plan of correction for deficiencies at the Polk Center involved a disciplinary review of those health care professionals implicated in the DOH's deficiency findings, beginning with the cases involving deaths of residents. (Tr. 10/28/02 at 58–59.) As to those cases, two physicians—Donald Stitt and David Byers, both American born—were found to be responsible parties. Subsequent to these findings, Dr. Stitt retired and Dr. Byers resigned. (*Id.* at 59–60.) It was DPW's practice at that time to discontinue the disciplinary process if an employee subject to administrative investigation terminated his or her employment. Accordingly, neither Dr. Stitt nor Dr. Byers were disciplined. (*Id.*) Disciplinary action was taken against certain other health care professionals relative to some of the deficiencies cited by DOH, but Plaintiff was not implicated in these incidents. (*Id.* at 68.) As to those Polk physicians, including Plaintiff, who had engaged in the practice of suturing and/or stapling patients' wounds without anesthesia, no disciplinary sanctions were imposed by DPW. Instead, the physicians were simply instructed to cease and desist this practice in accordance with Polk's new policy. (*Id.* at 60, 67–68.) There is no dispute that Plaintiff abided by the administration's cease and desist policy after its implementation.

DPW's standard practice in prior years had been to address concerns about an employee's professional performance solely through the regular administrative pro-

cesses—the same processes used to address issues such as misuse of leave time, employee theft, or the like. (Tr. 10/28/02 at p. 66.) However, given the gravity of DOH's findings, Dr. Gorton proposed in late 1996 that the incidents of deficiency cited by DOH also be independently evaluated by competent clinical authorities outside of DPW. (*Id.* at pp. 66–67.) Consequently, Dr. Gorton and Mr. Stauffer, in conjunction with other OMR officials, prepared a list of individuals implicated in the findings of deficient health care with the intent of notifying the appropriate licensing authorities. (*Id.* at 67–73, 95; Def.'s Ex. R and I.) On February 21, 1997 a final list was submitted to the Pennsylvania Board of Medicine so that the Board might determine if further action should be taken against those individuals from a licensing standpoint. (Tr. 10/28/02 at p. 68; Def. Exhibit. I.) Those persons identified included Plaintiff as well as Drs. Donald Stitt, David Byers, Cesar Miranda, Luka Makkar, and Nirmala Shrof. Four nurses were also identified, *to wit,* Louella DuPree, Amy Winger, Delores McQuiston, and Frantz Shelly. (Def.Ex.I.) Of these, several individuals—including Dr. Stitt, Dr. Byers and at least two nurses—were American-born. (Tr. 10/28/02 at p. 69–70, Def.'s Ex. I.) Both Plaintiff and Dr. Makkar were reported solely for their failure to use anesthesia when applying staples and/or sutures to patients' wounds. (Def.'s Ex. I.)

Notwithstanding these initial measures, a resident of the Polk Center died on March 6, 1997 under circumstances indicating substandard care. The doctor and nurses implicated in this event were immediately suspended and DPW moved to have them terminated.[2] (Tr. 10/28/02 at

76–77.) DOH was immediately advised of the incident. Upon this notification, DOH performed a three-day on-site survey of the Center. (*Id.* at 74, Def.'s Ex. T.) At the conclusion of this survey, DOH found that Polk was operating under deficiencies posing an "immediate and serious threat to the health and safety of [its residents]." (Def.Ex. T.) Accordingly, DOH issued a notice that the Center would be decertified in twenty-three (23) days if the deficiencies were not rectified. (Tr. 10/28/02 at pp. 74–76.) According to Dr. Gorton and Mr. Stauffer, this 23–day decertification notice was the most critical response that a facility could receive from DOH and an extremely unusual occurrence. (*Id.* at 75, 123.) Governor Tom Ridge mandated immediate changes at the Center. (*Id.* at pp. 77–78.)

Accordingly, DPW undertook a number of corrective measures. It attempted to secure "high quality on-site medical leadership" by arranging for Dr. Edward Shertz to become the interim Medical Director at Polk. (Trial Tr. 10/18/02 at 79.) Mr. Thomas Dougherty took over the responsibilities of the former Health Services Director. (*Id.*) In addition, Dr. Gorton and Mr. Stauffer put together a series of "expert teams" comprised of those professionals from other centers who were considered to be most highly qualified. These teams were brought in to help mentor the medical staff at Polk and provide consultative services. (*Id.* at 79–80.) DPW also began negotiations with Liberty Health Care ("LHC") in order to contract the services of additional physicians who would help fill the gaps in the Polk Center medical staff. (*Id.* at 80.) Dr. Gorton also engaged in meetings with the Polk staff

---

2. The physician—Dr. Miranda, a Phillipine individual—appealed his termination through the Civil Service Commission, but the termination was ultimately upheld. (Tr. 10/28/02 at 76–77.) The two nurses appealed their terminations through the union process and were ultimately reinstated with a lesser form of discipline. (*Id.* at 77.)

physicians and advised that he was putting their medical care "under the microscope." Dr. Gorton admits telling these physicians:

[t]hat they would be watched very, very closely. That if there were episodes of work performance which did not meet up to acceptable standards, that they were subject to progressive discipline under the Commonwealth's administrative policies. And if there were clinical issues that arose, which raised questions about the quality of care that they rendered to individuals, that those incidents would be reported to the appropriate licensing authorities for review and appropriate action.

(*Id.* at p. 81.) According to Dr. Gorton, this was meant to overcome a perceived resistance to change on the part of Polk staff physicians and to convey that

they were long passed arguing with the Department of Health. That what we needed to do was undertake a massive see change in what was happening at Polk Center, and bring a whole new standard of care to bear in the facility.

(*Id.* at 81–82.) Plaintiff recalled this meeting as follows:

he [Dr. Gorton] told me that I would continue to work with the organization. But he says that I'll be working under the microscope and any misconduct or mistreatment will be reported to the Medical Board, and I would be fired and I would lose my retirement.

\* \* \* \* \* \*

He said that I would be under the microscope. And any minor mistake would be reported to the Medical Board and I will be fired and lose my—retirement.

\* \* \* \* \* \*

What it meant is that for anything like, for example, if I don't examine a scratch, I could be reprimanded, if I don't examine a scratch. That's what the issue was.

(Tr. 10/25/02 at 11–12, 103.)

Meanwhile, pursuant to Polk's contract negotiations, numerous physicians from LHC were brought in as part of the plan to address the 23–day decertification threat. (Tr. 10/28/02 at 82.) Initially, these doctors were assigned to review the charts of every Polk resident in order to identify outstanding health care issues and develop a plan of action for each individual patient. (*Id.* at 83.) As a secondary component of the plan, LHC provided specialists who could address more particularly the special health care needs of Polk residents. (*Id.*)

Although they were originally contracted to provide consultative services, the LHC doctors eventually began treating Polk residents directly. Between March and May of 1997, all of the remaining Polk staff physicians aside from Plaintiff had left the Center.[3] In response, DPW began to use LHC doctors on a short-term basis to fill these gaps. At the same time, Dr. Gorton and others began negotiating long-term contracts with LHC to recruit physicians who could provide care at Polk on an on-going basis. (*Id.* at 84–85.) These physicians, some of whom were American-born and some of whom were foreign-born, were expected to follow the same practices and procedures imposed on Polk staff physicians. (*Id.* at 83–85.)

In late March of 1997, following approval by DOH of the Defendant's written plan for corrections and initial responsive measures, DOH converted its 23–day decertification notice into a 90–day decertification notice. (Trial Tr. 10/28/02 at 86, Def. Ex.

---

**3.** Dr. Miranda was terminated following the March 6, 1997 incident. Dr. Makkar was terminated for administrative reasons. Drs.

Shroff, Michael and Shin apparently resigned. (Tr. 10/28/02 at 84.)

U.) Thereafter, DPW continued implementing its plan of correction. Dr. Swick was hired as Polk's new Medical Director. In addition, each Polk resident was given a full medical assessment and a written health care plan that was reviewed and approved by DOH. New medical equipment was obtained for the Center, and various policies and procedures were updated. (*Id.* at 86.) By the end of June 1997 the DOH, satisfied with the progress that had been made in correcting Polk's former deficiencies, lifted the threat of decertification. (Tr. 10/28/02 at 86, 127.) At that point, Plaintiff was the only original staff physician remaining at Polk. (*Id.* at 86.)

In February of 1999, an employee of the Pennsylvania Attorney General's Office notified DPW that the Attorney General was in the process of filing criminal charges against Plaintiff based upon his previous practice of suturing and/or stapling wounds without anesthesia. (*Id.* at pp. 130–31.) In light of this information, Dr. Gorton and Mr. Stauffer met with Edward Sadosky (Polk's Facility Director) and numerous DPW officials to discuss a plan of action relative to Plaintiff's employment. (*Id.* at 100–101.) Plaintiff was arrested on February 26, 1999 and charged with eight counts of simple assault and eight counts of neglect of the care of dependent person. (*See* Def.'s Ex. V.) Drs. Stitt, Byers, and Makkar were also criminally charged but were no longer employed at Polk. (Tr. 10/28/02 at 86.)

Following his arrest on February 26, 1999, Plaintiff was verbally suspended from his employment at the Polk Center. In a March 5, 1999 letter to Plaintiff, Mr. Sadosky confirmed that Plaintiff was suspended as of February 26, 1999 for a period not to exceed 30 working days. In relevant part, that letter stated:

The reason for this action is your arrest on February 26, 1999 as a result of criminal charges brought by the Office of Attorney General of the Commonwealth of Pennsylvania, based upon sixteen (16) criminal counts arising from your employment at Polk Center. You are also suspended pending investigation because of the alleged conduct and actions set forth in the charges. Your arrest on criminal charges violates provisions of the Governor's Code of Conduct, Executive Order 1980–18. . . . All of the counts relate to your employment at Polk Center as described below.

\*　　\*　　\*　　\*　　\*　　\*

An investigation will be conducted during the course of this suspension and appropriate action will be taken at the investigation's conclusion. Action by Polk Center may include reprimand, disciplinary suspension, removal from employment, or reinstatement retroactive to the beginning of suspension.

This action is being taken under Section 803 of the Civil Service Act and can be appealed to the State Civil Service Commission, in writing, within 20 days of the receipt of this letter . . .

(Def.'s Ex. V.)

At the conclusion of the thirty-day suspension, *to wit,* April 4, 1999, Plaintiff's criminal charges were still pending. At that point, Plaintiff was placed on "compensable status," meaning that his pay and benefits were reinstated but he was precluded from working at the Center. (Tr. 10/25/02 at 10/28/02 at p. 146.)

Plaintiff was formally terminated from his employment effective June 4, 1999 as set forth in correspondence from Mr. Sadosky dated June 1, 1999:

. . . This is to inform you of your removal from your position of Staff Physician 2, regular civil service status, with the Department of Public Welfare, Polk Center, effective with the close of business on Friday, June 4, 1999.

The reasons for your removal are:

Your arrest on February 26, 1999 as a result of criminal charges brought by the Office of Attorney General of the Commonwealth of Pennsylvania, based upon eight (8) criminal counts arising from your employment at Polk Center. Your arrest on criminal charges violates provisions of the Governor's Code of Conduct, Executive Order 1980–18 and DPW 7174. Specifically, you are charged with eight counts of simple assault (all misdemeanors 2). Each of the counts relates to your employment at Polk Center as described below, and remains outstanding.

\* \* \* \* \* \*

This action is being taken under Section 803 of the Civil Service Act and can be appealed to the State Civil Service Commission, in writing, within 20 days of the receipt of this letter . . .

(Def.'s Ex. Y.) The decision to suspend and ultimately discharge Plaintiff was made collaboratively by Mr. Sadosky, Dr. Gorton, Mr. Stauffer, and numerous other DPW officials. (Tr. 10/28/02 at 100–101, 137.)

In October of 1999, the Pennsylvania Board of Medicine cleared Plaintiff of any professional misconduct. In addition, the Attorney General dismissed the criminal charges against Plaintiff in December of 1999. Thereafter, on January 24, 2000, Plaintiff was reinstated as a staff physician at Polk and was given back pay and benefits. (Tr. 10/25/02 at pp. 47, 52, 99.)

## II. Procedural History

In August of 2000 Plaintiff filed the instant civil action asserting claims under 42 U.S.C. § 1983 for the alleged violation of his federal equal protection and due process rights and claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000 *et seq.* for alleged unlawful employment discrimination. With regard to his Title VII claims, which included a request for both compensatory and punitive damages, Plaintiff asserted that he had been subjected to a hostile work environment and unlawfully discharged from his employment on the basis of his national origin and in retaliation for having defended the rights of other foreign-born individuals at the Polk Center. Plaintiff also asserted state law theories of defamation, slander, and intentional interference with contractual relations.

Pursuant to United States Magistrate Judge Kenneth Benson's recommendation, this Court granted summary judgment in favor of Defendant as to Plaintiff's state law claims, his § 1983 equal protection claim, his Title VII claim premised upon national-origin-based retaliation, and his request under Title VII for punitive damages. We denied the Defendant's summary judgment motion with respect to Plaintiff's § 1983 due process claim as well as his Title VII claims premised upon alleged discriminatory discharge and hostile work environment.

Trial in this matter commenced on October 23, 2002 and concluded on October 31, 2002. At the conclusion of testimony on October 29, 2002, Defendant orally moved for judgment as a matter of law on all of Plaintiff's outstanding claims. We granted Defendant's motion with respect to Plaintiff's § 1983 due process claim and his Title VII hostile work environment claim. We denied Defendant's motion with regard to Plaintiff's Title VII claim for alleged discriminatory discharge.

On October 30, 2002, a jury returned a verdict in favor of Plaintiff on the latter claim and awarded damages in the amount of $750,000 to compensate Plaintiff for his emotional harm.[4] Judgment was entered

---

**4.** Because Plaintiff had previously been rein- stated as a staff physician at the Polk Center

in favor of Plaintiff on October 31, 2002. Defendant filed this renewed Motion for Judgment as a Matter of Law or in the alternative, Motion for a New Trial on November 12, 2002.

### III. Standard of Review

■ A Rule 50 motion for judgment as a matter of law should be granted only if, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565, 568 (3d Cir. 2002) (citation omitted). Such a motion must be denied "if there is evidence reasonably tending to support the recovery by [the] plaintiff as to any of [his] theories of liability." *Hofkin v. Provident Life & Accident Ins. Co.*, 81 F.3d 365, 369 (3d Cir. 1996).

■ Rule 59(a) of the Federal Rules of Civil Procedure allows a party to seek relief from a judgment by filing a motion for a new trial. This relief may be sought on the grounds, e.g., that the verdict is against the weight of the evidence, that the damages are excessive, or that the district court made substantial errors in the admission or rejection of evidence or in its instructions to the jury. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940). Generally, the decision whether or not to grant a new trial "is committed to the sound discretion of the district court." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir.1984). The court's latitude varies, however, depending on the type of error alleged. *Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir.1993). Its latitude "is broad when the reason for

interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court," such as evidentiary rulings. *Id.* The court's discretion is more limited when granting a new trial on the basis that the jury's verdict is against the weight of the evidence; in such cases a new trial should be awarded "only when the record shows that the jury's verdict resulted in a miscarriage of justice or when the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). *See also Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir.1996); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735–36 (3d Cir.1988). A new trial may not be granted merely "because the evidence was sharply in conflict, because the jury could have drawn different inferences or conclusions, or because another result is more reasonable." *Shushereba v. R.B. Indus., Inc.*, 104 F.R.D. 524, 527 (W.D.Pa.1985). Moreover, a verdict may not be set aside when it is plausible or when it has a rational basis. *See Delli Santi*, 88 F.3d at 202. According to the Third Circuit, "[t]his limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its 'judgment of the facts and the credibility of witnesses for that of the jury,'" so as to effect a denigration of the jury system. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992) (citation omitted).

### IV. Discussion

#### Motion for Judgment as a Matter of Law

Initially, we consider DPW's motion for judgment as a matter of law relative to Plaintiff's claim that national origin was a

---

and granted back pay and benefits, he did not assert any claim for economic damages or

lost wages at trial.

motivating factor in his termination from Polk. We begin by reviewing the applicable burden-shifting framework first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In cases such as this one involving indirect proof of discriminatory animus, the plaintiff must initially make a prima facie showing of discrimination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). The higher federal courts have consistently advised that "the requirements of a prima facie case are flexible," *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir.1999), as "[t]he facts necessarily will vary in Title VII cases." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, "there is no rigid formulation of a prima facie case" that will fit all circumstances. *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir.1997). Generally, however, a plaintiff may meet her burden by showing that "she was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995).

If a plaintiff presents sufficient evidence to establish a prima facie Title VII violation, it then becomes the employer's burden to produce (i.e., articulate) a legitimate, non-discriminatory reason for its personnel action. *See King v. City of Philadelphia*, 66 Fed.Appx. 300, 2003 WL 1705967 at *1 (3d Cir.2003). Once the employer does so, the burden remains with the plaintiff to prove by a preponderance of the evidence that the employer's prof-

fered explanation was pretextual and that unlawful discrimination was the real reason for the employer's actions. *See Pivirotto*, 191 F.3d at 354 n. 4 (citation omitted).

In this case, there was no dispute that Plaintiff was a protected (i.e. foreign-born) individual, that he was qualified for the position of staff physician at Polk and that he was terminated from his job there. Nevertheless, the parties disputed whether a prima facie case had been sufficiently established. Plaintiff attempted to meet his burden by asserting that other Polk employees of American heritage, primarily Dr. George Magoun, had sutured patients without the use of anesthesia but had allegedly received more favorable treatment. Plaintiff also argued that his work conditions at Polk were impacted by many inconveniences and/or acts of harassment[5] not imposed on American-born doctors. Defendant countered that Plaintiff had failed to satisfy the fourth prong of his prima facie burden because there was no evidence that either: (a) he was replaced by someone outside the protected class or (b) a similarly situated individual outside the protected class was treated more favorably. (*See* Trial Tr. 10/28/02 at 185.) As to the latter point, Defendant vigorously argued that Dr. Magoun was not a proper comparator because Plaintiff's termination was premised on his criminal charges and, unlike Plaintiff, Dr. Magoun had never been arrested.

This Court ultimately rejected Defendant's motion for judgment as a matter of law partly because it considered Defendant's formulae for establishing a prima facie case to be unduly narrow. More

---

**5.** The Court previously entered judgment as a matter of law in favor of DPW as to Plaintiff's hostile environment claim. That distinct Title VII claim is not presently at issue. Nevertheless, the Court considered the evidence rela-

tive to Plaintiff's hostile environment claim insofar as it might constitute indirect evidence of national-origin discrimination bearing on Plaintiff's discharge.

specifically, we concluded that it was not a legal prerequisite that Plaintiff show he was replaced by an American-born doctor or that a similarly situated American individual was treated more favorably. We held that, while such a showing would allow Plaintiff to meet his prima facie burden, this type of proof was not the *only* method by which Plaintiff could do so. We noted that Plaintiff could make his prima facie case by showing more generally that the termination occurred under circumstances giving rise to an inference of discrimination. (Tr. 10/29/02 at 10, 13–14.) *See Matczak, Waldron, supra.* Although this Court considered it a "very close case," we ruled that there were sufficient factual disputes such that Plaintiff's Title VII termination claim should be submitted to the jury. (*Id.* at 12.)

On further reflection, the Court continues to have serious concerns as to whether a prima facie case for employment discrimination has been established on this record. For present purposes, however, we presume—consistent with the liberal teachings of *Pivirotto*—that it has, recognizing that the Plaintiff's burden of proof at this stage is not "onerous," as "the inquiry is based on a few generalized factors." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 646 (3d Cir.1998). We note that plaintiffs in other cases have satisfied their prima facie burden by showing, e.g., that: (i) s/he belongs to a protected class, (ii) s/he was qualified to perform the job at issue, (iii) s/he was terminated from the position, and (iv) the employer had a continued need for someone to perform the same work after the plaintiff's departure. *See Pivirotto,* 191 F.3d at 354 (citing *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 155 (1st Cir.1990)).

The Court does not perceive any serious dispute on this record as to the fact that Plaintiff (an Egyptian-born individual) was adequately qualified as a staff physician and that Polk continued to need similarly qualified physicians even after Plaintiff's departure.[6] Although DPW lodges several attacks on Plaintiff's proof, we think those challenges are better addressed at the pretext stage of analysis, "where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." *Simpson,* 142 F.3d at 646. Accordingly, we continue to find, albeit tentatively, that Plaintiff submitted enough evidence at trial to meet his minimal burden of proof at the prima facie stage.

Next, we note that the Defendant articulated a legitimate, non-discriminatory reason for Plaintiff's termination. At trial, Defendant asserted that Plaintiff was suspended and subsequently fired as a result of his arrest on criminal charges, consistent with the Governor's Code, the Civil Service Act and DPW policy.

■ The inquiry which we now face is whether Plaintiff submitted sufficient evidence at trial to sustain his ultimate burden of proving that DPW's proffered justification was a pretext and that the true reason for his termination was national origin discrimination. *See Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994) ("At trial, the plaintiff must convince the factfinder '*both* that the reason was false, *and* that discrimination was the real reason.' ") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original)). A plaintiff may accomplish this by pointing to evidence from which a factfin-

---

**6.** At the same time, however, we recognize that the inference of invidious discrimination which normally arises under such circumstances is arguably undermined where—as here—the employer hires the plaintiff back to fill the same position from which he was previously dismissed.

der could reasonably disbelieve the employer's articulated legitimate reason. *See Hicks*, 509 U.S. at 511, 113 S.Ct. 2742 (factfinder's rejection of employer's proffered reason permits, but does not compel, a verdict for the plaintiff). Alternatively, the plaintiff may introduce evidence from which the factfinder could reasonably conclude that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Simpson*, 142 F.3d at 644; *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 523 (3d Cir.1992). In this case, Plaintiff attempted to do both. For the reasons discussed below, we find this evidence insufficient as a matter of law to support the judgment.

### A.

■ "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [the impermissible factor] was a motivating or determinative factor in the employment decision." *Simpson*, 142 F.3d at 644–45 (citation omitted). For instance, "the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Id.* at 645 (citation omitted).

### 1. *Comparator Evidence*

■ At trial, Plaintiff sought to show that similarly situated, U.S.-born individuals were treated more favorably than himself. In particular, Plaintiff asserted that Dr. George Magoun, an American-born physician, had sutured an individual by the name of Robert Nelson in mid–1997 without using anesthesia.[7] Dr. Magoun worked at Polk from 1997 to 1998. (Tr. 10/23/02 at 4.) Plaintiff complained that Dr. Magoun was never fired, arrested, reported to the Board of Medicine, or otherwise disciplined for this conduct, despite his alleged violation of the cease and desist policy. Plaintiff sought to use this alleged disparate treatment as circumstantial evidence that DPW was motivated by a national origin-based animus in terminating his own employment.

■ This proof is legally insufficient to support Plaintiff's proffered inference for several reasons. First, insofar as Plaintiff complains that Dr. Magoun was never terminated from his employment at Polk, we find that Dr. Magoun is not a legitimate comparator. Comparators are persons "similarly situated" vis a vis the plaintiff. *Simpson*, 142 F.3d at 645. In determining whether similarly situated individuals outside the protected class were treated more favorably than the plaintiff, "our 'focus is on the particular criteria ... identified by the employer as the reason for the adverse action.'" *Pivirotto*, 191 F.3d at 359 (3d Cir.1999) (quoting *Simpson*, 142 F.3d at 647). DPW has consistently maintained throughout this litigation that the factor triggering Plaintiff's termination was the

---

7. Defendant vigorously disputed this allegation at trial. To that end, both Dr. Magoun and Bonita MacDonald (a registered nurse employed at Polk) offered testimony that Xylocaine had been given to Mr. Nelson, as reflected on Mr. Nelson's MR–34 form. Nevertheless, there was sufficient evidence from which a jury could have inferred that the notation as to the use of Xylocaine was a post-hoc fabrication. We, of course, express no opinion as to this factual dispute. Instead, consistent with our standard of review under Rule 50, we give Plaintiff the benefit of the doubt and assume for present purposes that Dr. Magoun did, in fact, suture without the use of anesthesia.

pendency of criminal charges filed by the Pennsylvania Attorney General's Office. There is no evidence to suggest that Dr. Magoun was ever arrested by the Attorney General's office and, thus, he is an invalid comparator in the context of Plaintiff's dismissal.

Second, to the extent Plaintiff complains that Dr. Magoun was never arrested for suturing patients without anesthesia, no inference adverse to DPW can be drawn. It is undisputed on this record that the Attorney General's office independently decided to file the criminal charges against Plaintiff and the other Polk physicians; neither the Polk Center nor DPW had any part in that decision. Furthermore, it is undisputed that DOH—not DPW—is the agency that notified the Attorney General's Office of the problems at Polk. This notification occurred when the DOH forwarded to the Attorney General its findings relative to the deficiencies at the Center. Although DPW was advised of this notification and later cooperated with the Attorney General's on-going investigation, the record does not permit any inference that DPW or Polk were somehow instrumental in bringing about Plaintiff's arrest.

Third, to the extent Plaintiff complains that Dr. Magoun was never reported to the Board of Medicine, the evidence does not provide any logical nexus between Dr. Magoun's alleged misconduct and those decision-makers who reported Plaintiff to the Board of Medicine. There is no evidence, for example, that either Dr. Gorton or Mr. Stauffer were specifically made aware of Dr. Magoun's alleged violation of the cease and desist policy.[8] In addition,

there is uncontradicted evidence that American-born doctors and nurses were disciplined and reported to the appropriate state licensing boards for engaging in practices that the Defendant considered to be substandard medical care, including the suturing of patients without anesthesia. (*See* Def. Ex. I.) Under these circumstances, Dr. Magoun is an invalid comparator and his circumstances provide no inference of discriminatory animus on the part of DPW.

In addition, to the extent Plaintiff complains that Dr. Magoun was never otherwise disciplined by DPW, no meaningful comparison can be made with Plaintiff's own conduct. Though Plaintiff was reported to the Medical Board, neither he nor any other Polk physician was ever disciplined specifically for suturing patients without the use of anesthesia; instead, DPW opted simply to implement a cease and desist policy. Moreover, Plaintiff claimed that he advised Polk administrators of Dr. Magoun's conduct in late 1999. At that point, DPW was in no position to "discipline" Dr. Magoun, as he had long since ended his tenure at Polk. (*See* n. 8, *supra.*)

At trial, Plaintiff vaguely asserted that other American-born physicians had sutured without the use of anesthesia but had suffered no adverse consequences. Notably, these physicians were not identified either in Plaintiff's closing argument or in his response to the instant motion. In any event, the evidence of record fails to advance Plaintiff's case. There was some testimony by Plaintiff that Dr. Shroff

---

**8.** Plaintiff testified that, in response to a directive by Mr. Sadosky, he advised Mr. Dougherty (Polk's Director of Services) and Wilbert Taylor (Polk's labor relations coordinator) in November 1999 that Dr. Magoun had sutured patients without anesthesia. (Tr. 10/25/02 at 18, 106.) However, there is no evidence that either Mr. Dougherty or Mr. Taylor was a decision-maker relative to Plaintiff's termination, nor is it clear whether this information was relayed to Mr. Sadosky. Even if it was, however, we note that Plaintiff imparted this information after Dr. Magoun's tenure at Polk had ended and long after the incident in question allegedly occurred.

had violated the cease and desist policy and was not reported to the Board of Medicine for this conduct; however, Dr. Shroff is a physician of Indian descent. (Tr. 10/25/02 at 16–18.) This evidence therefore fails to establish a pro-American bias on the part of DPW. The Court also received testimony from Mary Boyles, a registered nurse at Polk, to the effect that Plaintiff had undertaken a review of patient records and discovered that another doctor, Dr. Chizea, had allegedly sutured patients without using anesthesia. (Tr. 10/23/02 at 38–40.) However, there is no evidence to show that the relevant decision-makers were made aware of this alleged incident, nor is it clear from our review of the record whether Dr. Chizea is an American-born individual. Finally, there was testimony from Mr. Stauffer that he was aware of one case in which, following implementation of the cease and desist policy, a physician had applied a single suture or staple to a patient without the use of anesthesia and was not reported to the Board of Medicine. However, Mr. Stauffer could not be sure as to the exact year this incident occurred and, more importantly, he was unsure of the physician's identity or national origin; he was also unfamiliar with the circumstances surrounding that particular case. (Tr. 10/28/02 at 160–61.)

In sum, Plaintiff failed to produce any evidence that appropriate American-born comparators sutured patients without the use of anesthesia yet were treated more favorably than Plaintiff. Accordingly, no inference adverse to DPW can be drawn on this basis.

### 2. "Other Evidence" of Alleged Disparate Treatment

Plaintiff's Title VII claim is also premised, in part, on "other evidence" of discrimination which derives primarily from his own testimony and the testimony of Mary Boyles and Dr. Louka Makkar, another Egyptian-born staff physician at Polk.[9] This evidence, he claims, "established that [Plaintiff] was treated differently from American Born physicians at Polk in multiple ways." (Pl.'s Br. in Opp. to Def.s' Mot. for Judg. as a Matter of Law [Doc. No. 71] at pp. 3–4.) Ultimately though, these incidents provide no logical inference of national origin-based animus on the part of the relevant decision-makers.

By way of example, Mary Boyles, a supervising nurse at Polk, offered testimony that sometime in 1999 she was instructed by the Polk Center's Director of Health Services, Thomas Dougherty, to retrieve medical files involving cases in which Plaintiff had performed suturing of patients. According to Ms. Boyles, she was never asked to do the same for any American-born physicians working at the Center. (Trial Tr. 10/23/02 at pp. 27–28.) However, the mere fact that Mr. Dougherty did not ask Ms. Boyles to personally retrieve similar files from American-born physicians does not necessarily prove that such "purging" did not occur. To the contrary, Mr. Dougherty offered unrebutted testimony that, in connection with the Attorney General's investigation, "various people, including perhaps nurses," were asked to pull files for *all* physicians—including LHC doctors—who performed suturing at Polk. (Tr. 10/24/02 at 154–55.) Even assuming this conduct could be probative of

---

**9.** Plaintiff presented this evidence primarily in support of his Title VII hostile environment claim. At the close of the evidence, this Court entered a rule 50 judgment in favor of Defendant on that claim. (Tr. 10/29/02 at 8–9.)

Nonetheless, we allowed the jury to consider the hostile environment evidence insofar as it might be indirectly probative of DPW's mens rea in dismissing Plaintiff.

a discriminatory animus, it does not logically reflect on the motives of those who were responsible for firing Plaintiff. There is no evidence that Mr. Dougherty was a decision-maker relative to Plaintiff's discharge, nor is there any evidence that the actual decision-makers were aware of or sanctioned Mr. Dougherty's alleged discriminatory conduct.

Ms. Boyles also testified that Plaintiff and the other remaining Polk Center physician, Dr. Makkar, were relocated to different buildings several times between 1996–1999, while LHC physicians "primarily remained in one building." (*Id.* at 29–32.) However, Ms. Boyles admitted that she did not know who within Polk or DPW was responsible for the decision to relocate Plaintiff, nor did she have any first-hand knowledge of the reasoning underlying the moves. (Tr. 10/23/02 at 47–48.)[10] Furthermore, Ms. Boyles acknowledged that hundreds of LHC contract physicians provided services at Polk during the relevant time-frame; at times, there were different LHC doctors at Polk every week. (*Id.* at 44–45.) Without some idea as to which particular contract physicians were treated "better" than Plaintiff and how long they were present at Polk, it is illogical to use them as comparators. Perhaps more problematic is the lack of any direct evidence concerning the national origin of those LHC doctors who were allegedly treated preferentially. There is uncontradicted evidence that the LHC physicians who provided services at Polk were comprised, at any given time, of both American-born and foreign-born individuals. Ms. Boyles's testimony that LHC doctors were "primarily American-born" individuals and "primarily" remained in one building is not meaningful evidence of national-origin discrimination. *See Simpson,* 142 F.3d at 646 (" 'Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.' ") (quoting *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931 (7th Cir. 1993)).

As another example of "disparate treatment," Ms. Boyles testified about discrepancies in the manner in which doctors responded to Polk's on-call policies. It is undisputed that, following the DOH's findings of deficiencies and 90–day decertification notice, policies were put in place at Polk which required doctors to personally examine even minor injuries such as scratches and bruises and to report in person at a nurse's request when performing on-call duties. In addition, doctors were apparently required to complete an incident report following their examination. It was Ms. Boyles's contention that, while the state physicians adhered to these policies, the American-born LHC doctors often failed to do so yet were not reprimanded. In essence, Ms. Boyles asserted that American-born LHC doctors were subjected to less stringent expectations. (Tr. 10/23/02 at 33–37.) Notably, she provided no specific instances of disparate treatment to support these generalizations.[11] Nevertheless, assuming the truth

---

10. Plaintiff testified that, after January of 1999 he was moved at least four different times at the direction of Dr. Shertz, interim Medical Director, and later Dr. Swick. (Tr. 10/25/02 at 27–28.) Thomas Dougherty testified that he had some role in occasionally moving doctors from one location to another in order to accommodate changing case loads. (Tr. 10/24/02 at 149.) However, there is no evidence to suggest that any of these individuals played a role in Plaintiff's discharge.

11. Ms. Boyles did recite one incident where she reported an American-born doctor for failing to respond to a call involving an individual who had stopped breathing. (Tr. 10/23/02 at 37.) However there is no indication in the record as to whom Ms. Boyles made her complaint and what, if any, action was taken thereafter.

of Ms. Boyle's accusation, there is nothing in the record indicating that those individuals responsible for Plaintiff's termination were aware of or sanctioned this disparity in performance. Indeed, the record is silent at to whom, if anyone, along Polk's administrative chain-of-command was made aware of the situation.

Plaintiff also personally complained about the fact that he was called—almost on a daily basis—to examine minor injuries, even scratches. On one occasion, Plaintiff was called to inspect a red area on one patient whose diaper was being changed. By the time he arrived, the red area was gone. (Tr. 10/25/03 at 23–24.) Such instances, while no doubt inconvenient, do not support an inference of discriminatory animus relative to Plaintiff's termination. They merely show that Plaintiff adhered to the facility-wide policy requiring doctors to personally examine even minor wounds. There is no evidence to show that these calls were made for unlawful purposes or that they were made by a person having input relative to Plaintiff's dismissal.

Plaintiff complained that a certain amount of his on-call hours were transferred to LHC doctors as part of the contract negotiations to bring those doctors to Polk. (Tr. 10/25/02 at 24–26, 84–85.) However, the record is completely devoid of any evidence to suggest that only American-born LHC doctors were awarded on-call time, as opposed to foreign-born LHC doctors. Thus, no inference of unlawful discrimination arises from this event.

Plaintiff also presented testimony from Dr. Loukka Makkar showing that Plaintiff sutured minor wounds or lacerations on site at the Polk Center, whereas most LHC physicians referred these cases to the local emergency center in Franklin, Pennsylvania. (Tr. 10/24/02 at pp. 185–86.) However, this is not evidence of national-origin discrimination, as it is uncontradicted that both American and foreign-born doctors were contracted to provide services at Polk through LHC. Absent from Dr. Makkar's testimony is any evidence specifically showing that the American-born LHC doctors were treated more favorably than the foreign-born LHC doctors.[12] Further, there is once again an absence of any evidence showing that responsible decision-makers were aware of or sanctioned this practice. Thus, discriminatory animus cannot be imputed to them on the basis of this conduct.

Another of Plaintiff's complaints concerns statements made by Mr. Kucherawy relative to his request in December 1996 that Plaintiff step down from his position as Medical Director of Polk. According to Plaintiff, Mr. Kucherawy's explanation for asking Plaintiff to step down was that the position was being changed to an administrative position to be occupied by a non-physician for budgetary reasons. (Tr. 10/25/02 at 56.) However, in an open forum with Polk staff several days later, Mr. Kucherawy remarked that Plaintiff was being demoted from the Medical Director position because of the DOH's findings, implying that Plaintiff was responsible for poor medical care at Polk. (*Id.* at 9–11.) In addition, Mr. Kucherawy allegedly made a statement to Polk staff that "everybody did a good job except the physicians" and that "because of six physicians, 14 may lose their jobs." (*Id.* at 7.)

---

**12.** We note Plaintiff's allegation that he was required to perform suturing of minor lacerations on site and was not permitted to refer those cases to the local emergency center, whereas "the American born were allowed to send them to the ER." (Tr. 10/25/02 at 32.) However, without more detail or information as to which administrative officials (if any) sanctioned this disparate practice, no meaningful inference of discrimination on the part of relevant decision-makers can be drawn.

These statements provide no reasonable inference that Plaintiff's national origin factored into his dismissal. For one, Mr. Kucherawy was not a decision-maker in Plaintiff's termination and was himself removed as Facility Director in January of 1997. Second, Mr. Kucherawy's statements, even if offensive to Plaintiff, do not partake of any national origin animus. The criticisms of the Polk physicians appear to have been directed at six doctors implicated by the DOH's findings of deficiencies, which presumably included Drs. Byers and Stitt, both American-born doctors.

Plaintiff also points to the fact that the Medical Director position was occupied by a non-physician (Francis Dickert, Polk's Services Director) only for a period of four months, after which time an American-born physician, Dr. Swick, filled the position. However, evidence that a member of a non-protected group was apparently treated more favorably "can not be viewed in a vacuum." *Simpson,* 142 F.3d at 645. Defendant provided unrebutted evidence at trial that these administrative changes occurred during a period of crisis for the Center. Polk was existing under the imminent threat of decertification by the DOH, which had expressed "serious concerns about the quality of medical leadership at the facility" in the wake of its findings of deficient health care services. (Tr. 10/28/02 at 63.) Independent review teams had expressed the need for a change in medical leadership at Polk. (*Id.* at 62.) Dr. Gorton provided uncontroverted testimony that part of DPW's plan to try and save the Polk Center, especially after DOH issued its 23–day notice of decertification, included "stripping the best people" from DPW's other facilities and "rebuilding every clinical process" at Polk "from the ground up." (*Id.* at 76.) In fact, it was undisputed that the threat of decertification finally dissipated in late March 1997 largely because the DOH was satisfied with changes that had been implemented at Polk by Dr. Gorton, Mr. Stauffer and others, which included the hiring of Dr. Swick as the Center's Medical Director. (*Id.* at 86.) Aside from the fact that Dr. Swick happened to be American-born, Plaintiff has produced no evidence to show that the change in the medical director position was motivated by pro-American sentiment. We conclude that this incident, when viewed in the context of unrebutted evidence, provides no inference of national origin-based discrimination relative to Plaintiff's termination in June of 1999.

Plaintiff also complains about the manner in which Dr. Gorton behaved during telephone conferences that he held with the Polk staff physicians in February–March 1997 to discuss pending medical cases. Following the departure of Drs. Stitt and Byers, all of Polk's remaining staff physicians were foreign-born. According to Plaintiff, Dr. Gorton screamed at the doctors during these teleconferences and was sarcastic when Plaintiff tried to explain himself. In and of itself, this conduct does not partake of any national origin animus and therefore lacks probative value, although it may well have been offensive to Plaintiff.

However, Plaintiff also claimed that later, after American doctors were brought in to fill in gaps left by the departing staff physicians, those American-born physicians began to participate in the teleconferencing and were treated more courteously by Dr. Gorton:

> [Plaintiff]: Usually when [Dr. Gorton] talked to [the American-born doctors] he used the word please, oh that is nice [sic] job, you are very diligent, for doing the same thing I was doing.
>
> BY MR. BAILEY:
>
> Q. And when you were there with the other American-born physicians, did you get those same comments or the same mannerisms?

A. Never.

(Tr.10/25/02 at 13–14.) This sort of general allegation of disparate treatment, absent any other factual detail, cannot support an inference of national origin discrimination relative to Plaintiff's dismissal. Aside from making the general accusation of disparate treatment, Plaintiff provided no facts to demonstrate that these American-born doctors were truly similarly situated and therefore valid comparators.

Plaintiff also complained of Dr. Gorton's comment that he was placing the Polk doctors' care "under a microscope." He cites several instances following this comment in which he believes his medical care was unreasonably scrutinized to the point of harassment. Once again, however, these incidents cannot support an inference of national origin-based animus when viewed in the context of the undisputed evidence. For instance, Plaintiff complained of an incident in which he was called in by Mr. Dougherty and Dr. Shertz, made to wait for a half-hour, and questioned regarding his compliance with Polk's policy in cases involving hypothermia. It is undisputed that Plaintiff was given a chance to explain himself and that his explanation was accepted. (Tr. 10/25/02 at 21–22.) Plaintiff was never disciplined or further questioned as to this incident and suffered no loss of pay. (*Id.* at 81–82.) Nonetheless, he objected to the fact that his time was wasted and claimed that his compliance with the hypothermia policy should have been obvious from a review of the medical chart. This evidence simply does not bespeak an anti-Egyptian animus on the part of Dr. Gorton. At most, it demonstrates that Plaintiff's medical care was, in fact, put "under the microscope," but it does not logically follow that the motivating factor was his national origin.

Similarly, Plaintiff complains of an incident in which he was questioned concerning his failure to use anesthesia in connection with the removal of a resident's (Robert Mattis's) toenail. The undisputed evidence shows that a staff member expressed to Robert Muschick, a Residential Service Manager at Polk, some concern regarding Plaintiff's medical treatment of Mr. Mattis. (Tr. 10/24/02 at 42, 47–49.) Thereafter, Mr. Muschick reported the complaint to Mr. Dougherty who, in turn, asked Mr. Muschick to look into the matter. (*Id.* at 156.) Mr. Muschick then obtained a statement from Plaintiff. (*Id.* at 49–50.) Mr. Dougherty subsequently reviewed the situation with Plaintiff and Plaintiff was allowed to explain his view that the particular incident did not require the use of anesthesia. Mr. Dougherty then consulted with Dr. Swick and Dr. Gorton, who agreed that Plaintiff had acted appropriately under the circumstances. (*Id.* at 157–58.) As with the hypothermia incident, Plaintiff's explanation was accepted and he suffered no loss of pay or discipline; nonetheless, he objected to the inconvenience of having his time "wasted." (Tr. 10/25/02 at 81–83.) We simply do not find anything indicative of discriminatory animus in this episode.

As another example, Plaintiff complained of an incident in which he questioned the care rendered to a resident by the name of Hazel Allshouse. Plaintiff testified that he examined Ms. Allshouse in November 1998 and discovered bruising about the tongue and mandible and a laceration under her tongue. Ms. Allshouse had been examined the previous day by Dr. Woodemeyer, an American-born doctor, who apparently did not discover the laceration. In order to rule out subdural hemorrhage or fracture, Plaintiff referred Ms. Allshouse to the local emergency room for further studies. A CT scan showed an undisplaced fracture of the bone under the orbit, which required no further treatment. Nonetheless, Plaintiff asked that an inves-

tigation be commenced regarding possible abuse of the patient based on her injuries. (Tr. 10/25/02 at 33–34.) Plaintiff objected to the fact that, instead of being congratulated for his discovery, he was questioned by Dr. Swick several times about his decision to refer Ms. Allshouse to the local emergency center, his failure to administer pain medication, and the possible need for more tests. However, aside from being questioned, Plaintiff never suffered any adverse repercussions from this incident; he was not reprimanded or disciplined in any manner. (*Id.* at 35–36.) Plaintiff also objected to the fact that Dr. Swick never mentioned anything to Plaintiff about Dr. Woodemeyer's care. However, it is undisputed that two nurses—whom Plaintiff acknowledged may have been American-born—were disciplined concerning the matter. (*Id.* at 86–87.) This incident, like the others, raises no inference of discrimination based on national origin. The fact that Dr. Swick did not discuss Dr. Woodemeyer's conduct with Plaintiff says nothing about what, if any, action was taken with regard to Dr. Woodemeyer. Moreover, the fact that Plaintiff was interviewed on several occasions does not bespeak an attempt to discriminate against him because of his Egyptian heritage; rather, it suggests only that the administration was endeavoring to undertake a responsible investigation.

Taken collectively, these incidents do not raise an inference of discriminatory animus. Moreover, the events concerning the hypothermia patient, Mr. Mattis and Ms. Allshouse all involved Drs. Shertz and Swick and Mr. Dougherty—none of whom have been shown to be decision-makers in Plaintiff's termination. Furthermore, even if one can impute the conduct of these individuals to Dr. Gorton, it does not logically follow that the incidents were motivated by a national origin animus. It is undisputed that Dr. Gorton placed the medical care of *all* Polk staff physicians "under the microscope" following DOH's notice of decertification, which was premised on DOH's findings of numerous incidents of substandard health care at Polk. The fact that all the remaining staff physicians happened to be foreign born does not necessarily show that they were scrutinized *because* of their national origin. To the contrary, the only logical conclusion is that the Polk physicians were put "under a microscope" because they were all part of the former medical regime that had been cited by DOH for numerous deficiencies. On balance, all that these incidents show is that investigations of allegedly deficient care were investigated by administration and resolved in Plaintiff's favor without further adverse repercussion.

■ In sum, the circumstantial evidence relied upon by Plaintiff in support of his Title VII discharge claim does not individually or collectively raise an inference of discriminatory animus on the part of those who were ultimately responsible for Plaintiff's termination. Most of the incidents about which Plaintiff complains cannot be imputed to any person who influenced the decision-making process. To the extent the foregoing incidents *can* be imputed to actual decision-makers, they do not bespeak an anti-Egyptian prejudice. We also note that, while not legally required to establish a Title VII claim, there is no evidence that the relevant decision-makers either made or sanctioned derogatory comments or insults directed toward Plaintiff on the basis of his national origin.[13] As a matter of law, Plaintiff failed

---

13. Plaintiff testified that in late 1997 he requested Mr. Kucherawy to hire additional doctors at the Polk Center in response to under-staffing concerns. According to Plaintiff, Mr. Kucherawy represented that "there are two physicians in the list" and "Mike Stauffer told [Kucherawy] he prefers the

to produce "evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence" that Plaintiff's national origin was a "motivating or determinative factor" in his termination. *Simpson*, 142 F.3d at 644–45.

### B.

We next consider whether Plaintiff has cast sufficient doubt on Defendant's proffered explanation such that the jury could reasonably have concluded that the explanation was a pretext. To present a triable issue of fact, Plaintiff was required to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction" in the proffered explanation that a jury could rationally find it "unworthy of credence" and, thus, infer that it did not actually motivate Defendant in terminating Plaintiff's employment. *Simpson*, 142 F.3d at 644 (citation omitted).

At trial, DPW maintained that Plaintiff was terminated because of the pendency of his criminal charges, consistent with the Governor's Office Executive Order 1980–18 ("Governor's Code of Conduct") and DPW Policy Manual § 7177.3 ("Section 7177.3"). Part III of the Governor's Code provides, in relevant part:

2. **Required Action When an Employe is Formally Charged with Criminal Conduct Related to His or Her Employment with the Commonwealth or which Constitutes a Felony.** As soon as practicable after an employe has been formally charged with criminal conduct related to his or her employment with the Commonwealth or which constitutes a felony, such employe shall be suspended without pay. If such charge results in conviction in a court of law, such employe shall be terminated.

(Def.'s Ex. J, Pt. III, ¶ 2 (emphasis in original).) Section 7177.3 of the DPW Personnel Manual addresses in more detail the Department's "Responsibilities and Procedures for Reporting and Handling of Employee Criminal Conduct." (*See* Def.'s Ex. C.) It provides, in relevant part, the following directive:

3. Classified service employees

Part III [of the Governor's Code of Conduct] requires that employees charged with a felony or a non-felony work-related charge be suspended pending the outcome of the charges and be terminated if convicted. *However, since the Civil Service Rules*

---

black, however, the Asian had more seniority." (Tr. 10/25/02 at 46.) No logical inference of anti-Egyptian sentiment can be drawn from this alleged comment, as it does not pertain to the national origin of the doctor candidates. The statement might well mean that Mr. Stauffer preferred a black, American-born candidate to an Asian–American candidate. Alternatively, it might mean that Mr. Stauffer preferred a black, foreign-born candidate to an Asian, foreign-born candidate. In fact, all it shows is that Mr. Stauffer preferred one physician of minority race to another for reasons that might well have nothing to do with either race or national origin. Suffice to say that the comment provides no probative value in the context of this case.

Plaintiff also sought to introduce evidence from Robert Muschick that, around the time of the Robert Mattis incident, it was common to hear remarks among Polk personnel to the effect that Plaintiff and other staff physicians were "foreign" or were "not even Americans." (Tr. 10/24/02 at 137–38; 142.) This allegedly included both direct care staff and administrative personnel. (*Id.*) However, Mr. Muschick could not identify any particular individuals who had made these remarks, nor was there any basis in the record to link such comments with the decision-makers in this case. The evidence was therefore excluded. The Court continues to find that such evidence is irrelevant for purposes of Plaintiff's Title VII discharge claim. Evidence of "stray remarks by non-decision makers ... are inadequate to support an inference of discrimination by the employer." *Gomez v. Allegheny Health Services, Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995) (citation omitted).

*limit suspension actions to a total of 30 working days per year per employee, and Part III requires suspension to continue while the charges remain outstanding, the employee must be removed from employment if the charges remain unresolved at the conclusion of 30 working days. . . .*

(Def.s' Ex. C at ¶ D(3) (emphasis supplied).) It was Defendant's contention at trial that Plaintiff's suspension and termination were required by these provisions.

Plaintiff contends that he successfully undermined Defendant's proffered explanation by demonstrating that it was a post-hoc fabrication and that Defendant's conduct was inconsistent with the mandates of the Governor's Code of Conduct and § 7177.3. Having closely reviewed the record, we conclude that Plaintiff's proof was legally insufficient to discredit the Defendant's proffered explanation.

For instance, Plaintiff makes the assertion that Dr. Gorton "was part of the plan of action to terminate the employment of Moussa several days prior to the February 26, 1999 arrest date." (Pl.'s Br. in Opp. to Def.s' Mot. for Judg. as a Matter of Law [Doc. No. 71] at 4.) Plaintiff apparently sought to prove that his discharge was a foregone conclusion even prior to his arrest, and the pendency of the criminal charges was therefore not a factor in his termination. However, there was undisputed evidence that the Attorney General's office notified DPW of the impending charges approximately two weeks in advance of Plaintiff's arrest, and the relevant decision-makers met thereafter to determine what course of action should be taken in light of these impending charges. (Tr. 10/28/02 at 101–03, 130.) Dr. Gorton testified that this meeting ultimately cul-

minated in a plan to terminate Plaintiff's employment on the basis of his arrest, consistent with the Governor's Code and the DPW personnel policy manual. (*Id.* at 100–101.) Unlike Plaintiff, we do not believe that any inference of pretext can be gleaned from this event merely because it occurred before Plaintiff's arrest date and prior to the expiration of Plaintiff's 30–day suspension.

Plaintiff also makes much of the fact that § 7177.3 was not specifically referenced by Defendant in connection with certain pre-trial events. For example, § 7717.3 was not specifically cited in Plaintiff's letter of termination. In addition, Dr. Gorton submitted a response to a pretrial interrogatory in which he states that he, Mr. Sadosky and members of the DPW Executive Staff "convened" after receiving information about Plaintiff's impending criminal charges in order to "develop an action plan to accomplish Dr. Moussa's termination pursuant to the Governor's Code of Conduct"; no mention is made of § 7177.3. As another example, Plaintiff points to Michael Stauffer's testimony that October 23, 2002 (Day 1 of trial) "may" have been the first time that Defendant specifically asserted § 7717.3 as the reason for terminating Plaintiff's employment.[14] (Tr. 10/28/02 at 169–70.) We do not believe that this evidence is sufficient either to raise an inference of pretext.

In this case there was no genuine dispute that §§ 7174 and 7177.3 of the DPW Personnel Manual address matters of employee discipline: § 7174 (Def.s' Ex. Z) addresses methods of administering employee discipline consistent with just cause and due process concerns, while § 7177.3 (Def.s' Ex. C) addresses more particularly

---

**14.** Plaintiff claims Mr. Stauffer admitted that Defendant did not rely on § 7177.3 in the course of Plaintiff's unemployment compensation proceedings. In actuality, however, Mr. Stauffer merely testified that he did not attend those meetings and therefore did not know whether or not § 7177.3 was specifically asserted. (Tr. 10/28/02 at 158.)

procedures for handling instances involving criminal conduct on the part of DPW employees. There is no genuine dispute that these personnel policies were required to be applied in conjunction with the Governor's Code of Conduct. (*See* Def.s' Ex. C, § 7177.3 at ¶¶ (B), (C) and (D)(3), cross referencing the Governor's Code). Nor is there any dispute that §§ 7174 and 7177.3 both applied to Plaintiff, as did the Governor's Code of Conduct. Indeed, Plaintiff admits that under the facts of this case, the Governor's Code required his immediate suspension following his arrest and § 7177.3 required his termination, consistent with the Civil Service Act, when criminal charges were still pending at the conclusion of his 30–day suspension. (Tr. 10/25/02 at 87, 97–99.) Plaintiff's suspension and termination letters unequivocally stated that his arrest and violation of the Governor's Code were the reasons for the adverse employment action; Plaintiff's termination letter also generally referenced DPW personnel manual § 7174. In light of the foregoing, it is illogical to infer that Plaintiff's dismissal was *not* motivated by the pending criminal charges simply because § 7177.3 was not referenced in the termination letter.

Similarly, Dr. Gorton's failure to specifically reference § 7177.3 in his interrogatory response allows no reasonable inference of pretext. Dr. Gorton gave unrebutted testimony that the decision-makers met in advance of February 26, 1999 to discuss an appropriate plan of action relative to Plaintiff's employment in light of their knowledge that he would imminently be arrested. One cannot reasonably infer from this omission that Plaintiff's arrest was *not* a factor in his suspension and discharge.

Mr. Stauffer's statement that October 23, 2002 (Day 1 of trial) "may" have been the first time that Defendant specifically asserted § 7717.3 as the reason for terminating Plaintiff's employment is of no sig-

nificance in view of the fact that Defendant generally cited the DPW personnel manual in Plaintiff's termination letter. (*See* Def.s' Ex. Y, citing DPW § 7174.) In addition, Plaintiff's counsel acknowledged that Defendant had referenced § 7177 of the DPW manual in defending Plaintiff's EEOC proceedings. (*See* Tr. 10/25/02 at 91–92; *see* Tr. 10/28/02 at 170–71; *see also* Tr. 8/26/03 argument at 24.) Further, Mr. Stauffer testified repeatedly that it was understood the Governor's Code had to be interpreted and applied in conjunction with DPW policy statements such as § 7177.3. (Tr. 10/28/02 at 157, 159, 167.) On this record, Defendant clearly and consistently asserted Plaintiff's arrest as the justification for his discharge and repeatedly relied on both the Governor's Code and the DPW manual, at least in general fashion. In view of this record, Defendant's failure to specifically cite § 7177.3 does not create any reasonable inference that the proffered explanation was disingenuous.

Plaintiff also sought to undermine the Defendant's proffered reason by demonstrating that the decision-makers acted inconsistently with the mandates of § 7177.3. Plaintiff points to the fact that, following the 30th day of his suspension from Polk, he was not immediately terminated but was instead put on "compensable status" for another six weeks (i.e., he received his salary and benefits) until June 4, 1999 when he was fired. Because § 7177.3 on its face requires an employee's "remov[al] from employment if the charges remain unresolved at the conclusion of 30 working days," Plaintiff suggests that this inconsistency is additional evidence of pretext.

However, once again, Plaintiff's evidence must be viewed in the context of the entire record. Defendant offered unrebutted evidence that the 6–week delay in Plaintiff's termination was occasioned by many factors. In part, it was the result of

complications in scheduling Plaintiff's due process hearing which was a legal prerequisite to his termination. (Tr. 10/28/02 at 141–42.) In addition, Plaintiff's preliminary hearing in his criminal case was scheduled during this time frame. Mr. Stauffer testified that DPW wanted to see whether the criminal charges were dropped at the hearing, in which case Plaintiff could simply be reinstated from his compensable status—a process that would be less complicated than firing, and later rehiring, Plaintiff. (*Id.*) Furthermore, because Plaintiff had publically alleged that other doctors at the Polk Center had applied sutures or staples without the use of anesthesia, DPW called upon him to substantiate his claim. Defendant presented evidence that Plaintiff was directed on multiple occasions to disclose the names of those physicians along with any relevant documentary evidence but, at least initially, he did not do so. (Tr. 10/28/02 at 142–45; Def.s' Ex. W and X.) Thus, to the extent DPW acted inconsistently with § 7177.3 in delaying Plaintiff's termination, it proffered unrebutted reasons for that delay.

We also note that, during the six week interim when Plaintiff was on "compensable status," Defendant continued to pay Plaintiff and provide benefits. Thus, any so-called "inconsistency" on the part of Defendant inured to Plaintiff's benefit. When viewed in this context, the fact that Defendant waited six additional weeks to remove Plaintiff does not meaningfully discredit its claim that the termination was premised upon Plaintiff's pending criminal charges. Accordingly, a jury could not rationally conclude from this evidence that Defendant's proffered explanation was a lie.

In sum, Plaintiff has failed to produce sufficient evidence from which a jury could reasonably conclude, by a preponderance of the evidence, that national origin dis-

crimination was a motivating factor in his termination. Moreover, Plaintiff has produced no evidence to meaningfully discredit DPW's stated reason for his termination. Consequently, Defendant is entitled to judgment as a matter of law on this claim.

### Motion for New Trial

■ Where, as in the instant case, the Court grants motion for judgment as a matter of law, we are also required to conditionally rule upon the Motion for New Trial. *See* Fed. R.Civ.P. 50(c) ("If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial."). Here, DPW asserts that a new trial is appropriate because (a) the verdict is against the weight of the evidence; (b) legal errors were made on the jury instructions regarding comparators; (c) the jury's award of $750,000 in compensatory damages for emotional harm is barred by a statutory cap and was otherwise disproportionate to the injury; and (d) legal errors were made on evidentiary rulings.

### A.

We first consider Defendant's claim that the verdict in this case was against the weight of the evidence. In evaluating this request for relief, we recognize a new trial should not be granted unless "the record shows that the jury's verdict resulted in a miscarriage of justice" or "the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). A new trial may not be granted merely "because the evidence was sharply in conflict, because the jury could have drawn different inferences or conclusions, or because another result is

more reasonable." *Shushereba v. R.B. Indus., Inc.*, 104 F.R.D. 524, 527 (W.D.Pa. 1985). Moreover, a verdict may not be set aside when it is plausible or when it has a rational basis. *See Delli Santi*, 88 F.3d at 202.

 Notwithstanding these narrow parameters, we find this to be one of those rare cases in which an award of a new trial is appropriate. As we have previously discussed the evidence in detail, we will not rehash Plaintiff's proof at this juncture. Suffice to say that, for all of the reasons previously discussed, we find that Plaintiff's proof was insufficient to show that DPW's proffered explanation for his termination was a pretext and that Plaintiff's Egyptian heritage was a motivating factor. Although the Court is reluctant to disturb a jury's verdict in any case, we conclude that allowing the verdict to stand, on this record, would result in a miscarriage of justice. Accordingly, should our ruling on Defendant's Rule 50 motion be reversed, we would alternatively grant Defendant's motion for a new trial on the ground that the jury's verdict was against the weight of the evidence.

### B.

 Alternatively, the Court would grant Defendant's motion for a new trial on the grounds that it erred in instructing the jury on comparators. In relevant part, the Court's jury charge included the following instruction concerning Plaintiff's prima facie burden:

> Dr. Moussa has the initial burden of establishing what is called a "prima facie case" of national-origin discrimination. He can do so by showing that: (i) he belongs to a protected category of individuals—in this case, foreign born individuals, (ii) he was qualified to perform his job; (iii) he suffered an adverse employment action—in this case, termination of his employment; and (iv)

whether [sic] other similarly situated individuals outside of the protected class were treated more favorably or there were other circumstances giving rise to an inference of discrimination. The first thing you must do is decide whether Plaintiff has met his burden of establishing a prima facie case.

> With respect to the factor of whether other similarly situated individuals outside of the protected class were treated more favorably, Dr. Moussa contends that he was treated disparately or differently from other physicians who were American-born. The Department of Public Welfare, on the other hand, has argued that the treatment accorded these American-born physicians does not support a prima facie finding of discrimination because, according to the Department, those individuals were not similarly situated to Dr. Moussa. To establish a prima facie case by comparing himself to other American-born physicians, Dr. Moussa must first prove that he and these other physicians were similarly situated in all material respects. In this respect, I instruct you that in order for an employee to be similarly situated to another employee with whom he seeks to be compared, he or she must have dealt with the same supervisor or decision makers, must have been subjected to the same procedures and standards of conduct, and must have engaged in the same or similar improper conduct without differentiating or mitigating circumstances which would distinguish the conduct or the employer's treatment of the two employees. It is for you to determine whether the Department of Public Welfare's actions relative to these other individuals demonstrates a prima facie case of disparate treatment based on Plaintiff's national origin.

(*See* Jury Charge [Doc. No. 66] at 7–8.)

Defendant objects that the Court's jury charge was too vague, failed to identify

any appropriate comparators, and allowed the jury to consider evidence relative to improper comparators. We agree.

Although the Court views the foregoing instruction to be essentially a correct statement of the law, we conclude that it was improper to issue the instruction because the record here is devoid of any evidence showing that, in fact, appropriate American-born comparators existed and were treated more favorably than Plaintiff by the relevant decision-makers. Our instruction, while not necessarily inaccurate, permitted the jury to draw an inference of discrimination based on "comparator evidence" that, as a matter of law, was legally deficient on this record. Notwithstanding this error, we are cognizant that a new trial should not be awarded unless "the error was so prejudicial that 'refusal to take such action appears to the court inconsistent with substantial justice.'" *Hulmes v. Honda Motor Co., Ltd.*, 960 F.Supp. 844, 849–50 (D.N.J.1997) (citing Fed.R.Civ.P. 61), *aff'd*, 141 F.3d 1154 (3d Cir.1998) (Table No. 97–5135), *cert. denied*, 525 U.S. 814, 119 S.Ct. 49, 142 L.Ed.2d 38 (1998). Here, the disputed instruction appeared in a discussion of Plaintiff's prima facie burden [15] which, we have independently determined, was satisfied at trial. Nevertheless, the error was potentially prejudicial to Defendant because the jury was permitted to consider this "comparator evidence" in deciding the ultimate question of whether DPW was motivated by Plaintiff's national origin in terminating his employment. In the Court's opinion, allowing the verdict to stand in the light of this error would be inconsistent with substantial justice. Accordingly, we conditionally award Defendant a new trial on this basis as well.

## C.

Defendant also requests a new trial on the grounds that this Court committed legal error in admitting testimony from William Fee, Jr., M.D. relative to Plaintiff's alleged emotional harm. Dr. Fee is a pulmonologist who treated Plaintiff in 1999 for severe fatigue and a history of chest pain. The record shows that, in or around 1999 and 2000, Dr. Fee had several telephone conversations with Plaintiff during which he would discuss the stress Plaintiff was under at Polk and "talk him down." (Tr. 10/24/02 at 12.) At one point, Dr. Fee prescribed anti-anxiety medications for Plaintiff. Dr. Fee was not a licensed psychologist or psychiatrist and performed no psychological or psychiatric testing on Plaintiff. Nonetheless, he purported to opine to a reasonable degree of medical certainty that Plaintiff's anxiety was induced by the stress he encountered in being fired from Polk. (*Id.* at 13–14.) Defendant contends that Dr. Fee's testimony did not meet the standards for reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and, therefore, he should not have been permitted to render an expert opinion concerning Plaintiff's mental anguish.

We disagree. While it is true that Federal Rule of Evidence 702 requires an expert to possess some specialized knowledge of the field in which he purports to be an expert, it is not required that the expert have specialized knowledge as to the specific question at issue. *See Troendle v. Yellow Freight, Inc.*, No. 97–CV–2430, 1999 WL 554589 *1 (E.D.Pa. July 20, 1999) (plaintiff's physician would be permitted to testify as to plaintiff's mental distress in Title VII sexual harassment case despite

---

**15.** The Court recognizes in retrospect that, under *Pivirotto*, the issue of whether Plaintiff satisfied his prima facie burden was a legal determination that should not have been submitted to the jury. 191 F.3d at 347–48 n. 1.

the fact that the physician's experience and training was in family medicine). The fact that Dr. Fee was an internist rather than a licensed psychologist or psychiatrist affected the weight of his opinion, not its admissibility. *See id.* (citing cases).

▮ Nevertheless, even assuming the Court erred in allowing Dr. Fee's testimony, the error would not warrant a new trial because it did not affect Defendant's substantial rights. *See Betterbox Communications Ltd. v. BB Techs., Inc.,* 300 F.3d 325, 329 (3d Cir.2002) ("In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights."). *See also* Fed. R.Civ.P. 61. Dr. Fee's testimony was not essential in order for Plaintiff to establish a basis for mental anguish damages because, as we discuss below, Plaintiff's testimony alone was sufficient on this record. Nor do we think it likely that Dr. Fee's testimony substantially affected the jury's verdict. For the most part, it was factual in nature and merely cumulative of Plaintiff's testimony. To the extent Dr. Fee rendered an expert opinion that Plaintiff's mental anguish was causally linked to his termination, this opinion was not required for an award of damages, as Plaintiff's own testimony could support the necessary inference. Moreover, Dr. Fee was vigorously cross-examined on that point. Finally, the jury was instructed that it could accept some, all or none of Dr. Fee's testimony just like any other witness. In sum, we find that the admission of Dr. Fee's testimony—even if erroneous—would not warrant a new trial.

## D.

Finally, Defendant contends that the jury's award of $ 750,000 for emotional suffering is barred by the $ 300,000 statutory cap set forth at 42 U.S.C. § 1981a.[16] Plaintiff does not dispute this point and, accordingly, a remittitur would be appropriate in the event that the jury's verdict were permitted to stand.

However, Defendant further argues that the evidence was legally insufficient to support even an award of $300,000. DPW contends that, at most, Plaintiff could recover only nominal damages because he failed to produce any evidence of actual injury. Defendant seeks a new trial or, in the alternative, remittitur on this basis.

▮ A district court may grant a new trial on the basis of excessive damages "where a miscarriage of justice would result if the verdict were to stand." *Gagliardo,* 311 F.3d at 572 (citing *Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282, 289 (3d Cir.1993)). Assuming the record here could support a finding of liability, we would not grant a new trial on this particular basis because the evidence was sufficient to support an award of mental anguish damages.

▮ "To recover compensatory damages in a Title VII case, the plaintiff must present evidence of actual injury." *L.T. Blackshear v. City of Wilmington,* 15 F.Supp.2d 417, 430 (D.Del.1998) (citing *Gunby v. Pennsylvania Elec. Co.,* 840 F.2d 1108, 1121 (3d Cir.1988)). However, neither medical evidence nor corroborating testimony is necessarily required in order to support an award of mental anguish damages. *Id. See also Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1046 (5th Cir. 1998); *Delph v. Dr. Pepper Bottling Co.,* 130 F.3d 349, 357 (8th Cir.1997); *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211,

---

**16.** Pursuant to 42 U.S.C. § 1981a(b)(3)(D), Plaintiff's non-pecuniary damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and the like is capped at $300,000. *See* 42 U.S.C. § 1981a(b)(3)(D) (applicable to employers with more than 500 employees).

1215 (6th Cir.1996); *Bolden v. Southeastern Pa. Trans. Auth.*, 21 F.3d 29, 34 (3d Cir.1994) (§ 1983 case). Further, courts have held that intangible injuries such as sleeplessness, headaches, and feelings of humiliation and embarrassment are sufficient to support an award of compensatory damages. *See Blackshear*, 15 F.Supp.2d at 430.

 On review of the record, we disagree with Defendant's contention that Plaintiff failed to establish actual injury. Plaintiff's testified—albeit succinctly—that he felt "devastated" following his termination from Polk, and he experienced multiple symptoms including anxiety, sleeplessness, and increased episodes of heartburn. He was unable to care for his family and, due to loss of income, was forced to cash in savings bonds that he had put aside for his children's education. His symptoms persisted from the time he was fired until a few months into his reinstatement at Polk when Plaintiff became re-acclimated at work. During this time he sought treatment from Dr. Fee and was prescribed a narcotic for pain symptoms as well as anti-anxiety medication. (Tr. 10/25/02 at 51–53.) While testifying on this point, Plaintiff became emotional and required a break in the proceedings in order to regain his composer. The evidence cumulatively was sufficient to support an award for mental anguish damages.

 Nor do we believe a remittitur below the $300,000 cap would be warranted in the event that Plaintiff's judgment is permitted to stand. Remittitur may be appropriate "when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Board of Educ. of the Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986). Based upon our review of the record, we do not believe this standard is met; accordingly, we would not further disturb the jury's damage award.

## V. Conclusion

For the foregoing reasons, this Court grants the Defendant's Motion for Directed Verdict and conditionally grants Defendant's Motion for New Trial. The Court conditionally grants Defendant's motion for remittitur to the extent that Plaintiff's emotional damages award should be capped at $300,000. An appropriate Order follows.

## *ORDER*

AND NOW, this ____ day of October, 2003, as set forth in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED THAT:

1. the Defendant's Motion [Doc. No. 67–1] for Judgment as a Matter of Law is GRANTED; and

2. the Defendant's Motion [Doc. No. 67–2] for a New Trial is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED THAT, inasmuch as the Defendant's Motion for Judgment as a Matter of Law is granted, Plaintiff's Motion [Doc. No. 68] for Attorney's Fees is DENIED.